Guenter REIMANN, Plaintiff,

v.

The SATURDAY EVENING POST COMPANY, Curtis International, Ltd., Defendants.

No. 75 Civ. 5599 (VLB).

United States District Court, S. D. New York.

Jan. 16, 1979.

David & Schreiber, New York City, for plaintiff.

Vogel, Marks & Rosenberg, New York City, for defendants.

## OPINION ORDER [1]

VINCENT L. BRODERICK, District Judge.

### I

Guenter Reimann ("plaintiff"), an expert in international finance and monetary matters, developed, between 1947 and 1973, various informational publications on finance which were subscribed to, for substantial annual fees, by a constantly growing group of clients. The publications were made available through International Reports, Inc. ("Reports"), a New York corporation wholly owned by plaintiff.

Reports was a successful venture. Plaintiff (and to a lesser extent his wife) drew substantial funds from the venture by way of salary. He was elderly, but he had a young family for which he wished to provide adequately. He was notified by his attorney that the only way in which he could realize upon the very substantial equities which had resulted from his success in developing the business of Reports was to sell the company. In 1973, therefore, and perhaps even before that, plaintiff explored various possibilities for the sale of Reports.

Defendant The Curtis Publishing Company ("Curtis Publishing") is a Pennsylvania corporation. Defendants The Saturday Evening Post Company ("Saturday Evening Post") and Curtis International, Ltd. ("Curtis International") are Delaware corporations which are wholly owned subsidiaries of Curtis Publishing. All defendants maintain their principal offices for the transaction of business in Indianapolis, Indiana. They are collectively referred to herein as "the defendant."

Curtis Publishing has had a long history in the magazine publishing field. It fell upon hard times, and in 1972 it completed a plan of recapitalization. Curtis Publishing had substantial federal taxable loss carryovers to the years 1973 through 1976, and in 1973 was actively seeking to acquire profitable small corporations, so that this loss carryover could be applied to their income.

In the spring of 1973 plaintiff and Curtis Publishing were brought together, apparently by two finders who were operating independently. From that time and until October 17, 1973, plaintiff, through his attorney, and Curtis Publishing participated in oral negotiations and exchanged proposed drafts of an agreement. Plaintiff discussed the drafts, as well as the final agreement, with his attorneys and with his accountant. Plaintiff sold Reports to Saturday Evening Post as nominee of Curtis Publishing by a Stock Purchase Agreement ("the Agreement") dated October 17, 1973.[2]

In 1975 plaintiff brought this action.[3]

This court has jurisdiction of the matter under 28 U.S.C. § 1332(a) since more than $10,000 is involved and there is diversity of citizenship between plaintiff and each of the named defendants.

I have held a bench trial. I find that none of the allegations in the complaint has been established, and the complaint is dismissed. I find that defendant is entitled to immediate possession of Reports, and that no further monies are due and owing to plaintiff. Plaintiff is enjoined from interfering with defendant's operation of Reports or from attempting to lure customers or correspondents of Reports to plaintiff for his own benefit.

1. This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

2. Saturday Evening Post's rights and obligations under the Agreement were thereafter assigned to Curtis International.

3. Plaintiff charges the defendant with fraud and violation of the securities laws; he also alleges mutual mistake in that there was no meeting of the minds with respect to the meaning of crucial provisions of the Agreement. He also alleges breach of the Agreement by defendant. He seeks, *inter alia,* rescission, reformation, specific performance, and damages. Defendant has demanded by counterclaim that plaintiff be required to deliver possession and control of Reports to it. Defendant seeks a declaratory judgment that no further monies are due and owing from defendant to plaintiff and an order enjoining plaintiff from interfering with defendant's operation of Reports or from attempting to lure customers or correspondents of Reports to plaintiff for his own benefit.

## II

The agreement executed by the parties provides that the agreement is to be interpreted in accordance with the law of New York, and I shall accordingly apply New York law in the interpretation of the agreement and in determining the issues raised in the common law counts. *Levey v. Saphier*, 83 Misc.2d 146, 370 N.Y.S.2d 808 (Sup.Ct. 1975). Federal law is applicable with respect to the securities counts of the complaint.[4]

## III

■ On October 17, 1973, a complete and integrated Agreement was executed by plaintiff and defendant at a formal closing. In normal course the execution of such an agreement bars consideration of parole evidence intended to vary the import of the agreement. 3 *Corbin on Contracts* § 573 at 357 (1960). The allegations of fraud and of mistake of fact require, however, that, if necessary, parole evidence be considered in determining the issues raised by those allegations. *Id.* § 573 at 366, § 580 at 431. I therefore received evidence of the background of the Agreement and of the negotiations which led to its execution.

The portions of the Agreement crucial to the case before me[5] are set forth below:

4. Plaintiff claims that defendant is guilty of fraud with regard to statements made in or omitted from defendant's published corporate documents. Putting aside for the moment plaintiff's standing problems, I find these claims to be without merit.

5. Additional portions of the Agreement provide:

### Stock Purchase Agreement

THIS AGREEMENT, between Guenter Reimann of New York, New York (hereafter referred to as "Seller"), holder of all of the outstanding common stock of International Reports, Inc., a New York corporation (hereafter referred to as the "Company"), and The Saturday Evening Post Company, a Delaware corporation (hereafter referred to as "Buyer"), WITNESSES:

WHEREAS, Seller desires to sell, and Buyer desires to acquire, all the outstanding common stock of the Company, for the consideration set forth below:

NOW, THEREFORE, in consideration of the respective representations, warranties and agreements hereinafter set forth, and subject to the exceptions set forth on the attached exhibits, Seller and Buyer represent, warrant and agree as follows:

1. *Sale and Purchase of Stock.* In reliance on the representations, warranties and covenants contained herein and subject to the terms and conditions hereof, Seller is selling to Buyer, and Buyer is purchasing from Seller, 5 shares of the Company's common stock, no par value per share (the "Common Stock"), representing all of the outstanding shares of Common Stock.

Seller is delivering to Buyer good and marketable title to the shares sold hereunder by such Seller, free and clear of all claims, liens, options, charges and encumbrances of any nature whatsoever, by delivering to Buyer a certificate or certificates evidencing such shares, duly endorsed in blank for transfer or accompanied by stock powers duly executed in blank, with Seller's signature guaranteed by a bank which is a member of the Federal Reserve System or a firm which is a member of the New York Stock Exchange, and with all requisite documentary or stock transfer tax stamps affixed. Seller will pay all federal, state, county and local taxes (including, without limitation, all requisite transfer taxes, if any) which may be due or payable by him by reason of the consummation of such sale and purchase. Seller will also pay all of his expenses (including, without limitation, the fees and expenses of his counsel) incurred in connection with the preparation and performance of this Agreement.

The purchase price of the Common Stock shall consist of the sum of the Base Purchase Price described in paragraph 2, and the additional purchase price, if any, described in paragraph 3.

2. *Base Purchase Price.* The "Base Purchase Price" shall be $1,650,000.00. During the period beginning on the opening of business on this date and ending the close of business on December 31, 1976 (the "Computation Term"), the Company shall account for all cash received by it (a) from the conduct of its business, including cash receipts on the Company's accounts receivable, (b) from refunds of taxes paid, and (c) from the sale of securities owned at this date. From such total cash received shall be subtracted cash paid by the Company during the Computation Term (a) for all ordinary and necessary expenses (excluding federal income taxes), (b) for capital expenditures (net of any funds borrowed for the purposes of paying for such capital expenditures), and (c) for repayments of principal of any money borrowed for such capital expenditure. The computation of such net cash receipts (the "Post-Affiliation Cash Flow") shall be certified by the Buyer's independent certified public accountants who shall become the Company's auditors. A

2. *Base Purchase Price.* The "Base Purchase Price" shall be $1,650,000. The Buyer is paying the Seller, as the first payment of the Base Purchase Price, in cash, $100,000. . . . the second installment [is] $300,000. On the first day of each February thereafter Buyer shall pay Seller an amount equal to one-half of the Post-Affiliation Cash Flow of the Company [as of] the previous December 31 . . . and on the first day of each May Buyer shall pay Seller the remainder of the Post-Affiliation Cash Flow for the previous year until either (a) the total Base Purchase Price plus interest shall have been paid, or (b) until the May 1, 1977, payment shall have been made. *In either event, no further payments on the Base Purchase Price shall be made.*[6]

(emphasis added).

\* \* \* \* \* \*

3. *Additional Purchase Price.* In the event that the Post-Affiliation Cash Flow during the Computation Term shall exceed the sum of the deferred balance of the Base Purchase Price and the interest thereon, as provided in paragraph 2, the Buyer shall pay the Seller, as additional purchase price for the Common Stock, one-half of such excess Post-Affiliation Cash Flow on May 1, 1977.

The import of the underlined sentence in paragraph 2 is that payments by defendant to plaintiff for the purchase of Reports would cease as of May 1, 1977; the full purchase price would equal whatever payments had been made as of that date, whether less than or greater than the Base Purchase Price of $1,650,000. Thus, if before December 31, 1976, the cash flow of Reports as defined in the Agreement exceeded the Base Purchase Price of $1,650,000 and interest thereon, plaintiff would receive as purchase price $1,650,000 and in addition one-half of that cash flow in excess of the $1,650,000 plus interest. If such cash flow did not equal the Base Purchase Price of $1,650,000, plaintiff would receive only the full amount of such cash flow. In either case, full payment was to be made by May 1, 1977.

On October 17, 1973, plaintiff and defendant Saturday Evening Post executed a promissory note ("the Note") whereby said defendant promised to pay to plaintiff the sum of $1,550,000 with interest ($100,000 had been paid at the closing). The Note provided that all of the terms of payment are contained in the Agreement. The Note was subject to the same cutoff date of May 1, 1977 as discussed *supra* regarding the Agreement. My findings herein as to the

---

statement of such accounting shall be prepared and submitted to Seller on or before May 1 of each year of the years 1974–1977 and a preliminary estimate of the Post-Affiliation Cash Flow shall be prepared by the Company's chief financial officer and submitted to Seller on or before February 1 of each of these years.

The Buyer is paying the Seller, as the first payment of the Base Purchase Price, in cash, $100,000. On January 2, 1974, Buyer shall pay Seller, as the second installment of Base Purchase Price, $300,000. On the first day of each February thereafter Buyer shall pay Seller an amount equal to one-half of the Post-Affiliation Cash Flow of the Company at the close of business on the previous December 31 (based upon the preliminary estimate to be supplied) and on the first day of each May Buyer shall pay Seller the remainder of the Post-Affiliation Cash Flow for the previous year until either (a) the total Base Purchase Price plus interest shall have been paid, or (b) until the May 1, 1977, payment shall have been made. In either event, no

further payments on the Base Purchase Price shall be made.

Each payment of the Post-Affiliation Cash Flow beginning in February, 1974, shall include both a principal payment on the deferred portion of the Base Purchase Price and simple interest to that date from the date hereof on the amount of principal then received. The interest rate on each payment, whether made on February 1, May 1 or any date of prepayment, shall be equal to the tier one prime rate of interest charged by Chemical Bank, New York, New York, on the preceding December 31.

Buyer may prepay all or any portion of the Base Purchase Price, plus interest due as computed above, at any time but such prepayment shall not affect the obligation to pay the additional purchase price provided in paragraph 3.

6. Every draft exchanged between plaintiff and Curtis Publishing included this crucial concluding sentence.

validity of the Agreement and as to plaintiff's knowledge and understanding of the terms of the Agreement apply equally to the terms of the Note.

Plaintiff's position is that he is entitled to the Base Purchase Price of $1,650,000, irrespective of what the Agreement provides. Plaintiff seeks to avoid the clear language of the Agreement by alleging mistake and fraud.

## IV

"In the absence of a showing of contrary public policy, or fraud, or mistake, the meeting of the minds expressed in the contract should ordinarily be enforced." *Arthur Young & Co. v. Leong*, 53 A.D.2d 515, 383 N.Y.S.2d 618, 619 (1976). *See also Division of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191, 198 (Sup.Ct.1969) ("Under general contract principles and in the absence of special circumstances, courts will not interfere with the parties' contractual obligations." (citations omitted)), *aff'd*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (1970). As stated above, the contract clearly provides that no further payments would be made to plaintiff after May 1, 1977 even if the aggregate of payments under the Agreement up to that date did not equal the Base Purchase Price. Plaintiff understood this when he executed the Agreement.

I find that plaintiff's claims with respect to the Agreement—mistake, fraud, illegality, unconscionability, and lack of consideration—are without merit.

### Mistake and Fraud

"[M]istake means a state of mind that is not in accord with the facts." 3 *Corbin on Contracts* § 597 at 579 n.1 (quoting *Restatement, Contracts* § 500).

■ Plaintiff's claims—that there was mutual mistake or at least that there was no meeting of the minds because he was mistaken as to the significance of paragraph 2 of the Agreement, or that he was defrauded as to the significance of that paragraph—are contradicted by the record, and I reject them. Plaintiff is a sophisticated businessman and is capable of understanding agreements that he signs. Plaintiff was advised by counsel and by his accountant. The attorney with whom plaintiff discussed the final drafts and the Agreement, John French, testified before me, and I find his testimony credible, and I find the testimony of plaintiff on this matter incredible.[7] Plaintiff understood the ramifications of the crucial paragraph: he knew that the purchase price was limited to payments made pursuant to the terms of the Agreement up to the deadline of May 1, 1977, and that there would be no payments thereafter; he knew when he executed the Agreement that the amount he was to receive under the Agreement was limited to cash flow up to December 31, 1976 and was confident that the cash flow of Reports would equal or exceed the Base Purchase Price of $1,650,000.

Plaintiff's claims of mistake and fraud are rejected.

### Illegality

■ A party cannot successfully attempt to enforce or to defend upon a contract or a part of a contract which is illegal under the laws of the State of New York or under the laws of the United States. *See Silvera v. Safra*, 79 Misc.2d 919, 361 N.Y.S.2d 250, 252–53 (Sup.Ct.1974); *Bishop v. Bishop*, 62 Misc.2d 436, 308 N.Y.S.2d 998, 1000 (Sup.Ct. 1970).

■ Plaintiff entered into the Agreement for tax purposes: it provided him with the opportunity to receive the value of the equity in Reports on a long-term capital gains basis. The fact that the purchase price was not fixed does not make the

---

**7.** Plaintiff has brought an action in the Supreme Court of the State of New York against Mr. French for malpractice in connection with his representation of plaintiff in connection with the Agreement.

Agreement illegal.[8] The Agreement is not illegal under federal or New York law.

### Unconscionable Consideration

■ The general rule in this state is that courts will not question the consideration agreed upon by the parties at the time the contract was made, *Kirshner v. Spinella*, 73 Misc.2d 962, 343 N.Y.S.2d 298, 300 (Dist.Ct. 1973), except to determine whether the bargain is grossly unreasonable or unconscionable. *In Re Estate of Vought*, 70 Misc.2d 781, 334 N.Y.S.2d 720, 728 (Surr.Ct.1972), aff'd, 45 A.D.2d 991, 360 N.Y.S.2d 199 (1974).

■ In the case before me, plaintiff and defendant agreed that plaintiff would receive, until May 1, 1977, amounts equal to the cash flow of Reports from October 17, 1973 to December 31, 1976, minus certain expenditures. The parties agreed further that payments would cease as of May 1, 1977 even if the Base Purchase Price of $1,650,000 had not been met, and that if such cash flow exceeded $1,650,000 plus interest, plaintiff would receive in addition one-half of the excess. Thus, plaintiff, confident that Reports would generate a generous cash flow, was, in effect, "betting" that there would be cash flow in excess of, and certainly not less than, $1,650,000. Having lost his "bet," plaintiff now seeks to avoid the consequences of the gamble. This he cannot do.

> When a contractual [payment] is aleatory in character, the [payment] being expressly made conditional upon an uncertain . . . event, the [payee, plaintiff] bets that it will happen and the [payor, defendants] bets that it will not. The consideration exchanged for such a promise [of payment] varies in proportion to their opinions as to probability. They

consciously assume the risk. . . . They were aware of the uncertainty, estimated their chances, and fixed the compensation accordingly.

3 *Corbin on Contracts* § 598 at 584–86 (1960).

The Agreement was a valid agreement. The terms of the Agreement were not unfair or unconscionable and adequate consideration did pass between the parties to the Agreement.[9]

### V

Plaintiff has raised other claims which arise upon a finding by this court that the Agreement is valid. Having made such a finding, I address plaintiff's other claims 1) that the Note is in default due to insolvency of defendant; and 2) that the Note is in default due to defendant's failure to make the payment due February 1, 1977.

### Default by Statement of Insolvency

The Note provides in pertinent part:

3. *Default.* Default hereunder shall exist

(a) if Payor shall:

 * * * * * *

(iii) admit in writing its inability to pay its debts generally as they become due;

 * * * * * *

Upon the occurrence of a default hereunder the whole of this note (principal and accrued interest) shall become due and payable and, until paid, interest shall accrue at the highest legal rate permitted by law.

Plaintiff asserts that default under Section 3(a) of the Note occurred when, in a

---

**8.** Plaintiff argues that the Agreement is illegal because there was no sale, since the buyer, defendant, was not committed to absolute payments. The fallacy of this argument requires little comment aside from recognition that the Supreme Court, in *Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), found that a transaction was a sale even though the payments of the

price established were to come only from the earnings of the company sold. Plaintiff's efforts to distinguish *Brown* are unconvincing.

**9.** My findings as to plaintiff's knowledge and understanding of the Agreement and as to the legality of the Agreement apply to all terms and conditions contained in the Agreement.

footnote in Defendant's 1976 Annual Report to Shareholders, defendant made the following statements:

6% Subordinated Income Debentures Due 1986

During 1976, the Company purchased from various holders 6% Subordinated Income Debentures due 1986 in the principal amount of $280,600. With such purchase, the Company was also relieved of the obligation to pay $158,539 in accrued interest. The total cash consideration paid for such debentures was $70,007. The resulting gain from the early extinguishment of debt is shown in the accompanying financial statements without any federal income tax effect. *The Company has not recorded any tax on these transactions on the basis that it is technically insolvent both prior and subsequent to the transactions.*

It is the policy of the current management that *so long as the Company has an accumulated deficit, interest on the Debenture will not be paid, even if earned within the terms of the Debenture,* without the requirement to do so by a valid order from a Court of competent jurisdiction. *In the event the Company's accumulated deficit is overcome,* the payment of interest will be resumed; however, *it is not anticipated this will occur for some years.*

(Emphasis added).

■ The statement in the Annual Report that the company is "technically insolvent" is not to be equated, as plaintiff would equate it, with the Note provision regarding "inability to pay debts generally as they

become due." The defendant was in fact able to pay its debts "generally as they became due." The technical insolvency referred to in the Annual Report is insolvency in a mathematical or accounting sense: *i. e.,* the aggregate value assigned to assets as carried on the books of defendant was less than the aggregate amount of the liabilities on defendant's books. This state of affairs existed when the Agreement was made, and the plaintiff knew of its existence when he executed the Agreement.

Plaintiff's reliance on the other quoted portion of the Annual Report for his argument that defendant was in default under the terms of the Note is misplaced. The reference to the Debenture in the second paragraph quoted above does not speak in terms of inability to pay; rather, it speaks in terms of a decision that the interest "will not be paid"—a decision not to pay interest regardless of ability to pay. The company, in the Annual Report, did not "admit in writing . . . inability to pay debts. . . ." I find also that the reference to "accumulated deficit [which must be overcome before] payment of interest will be resumed" must be interpreted similarly to the term "technically insolvent," discussed above.

Thus I find that plaintiff has not prevailed on its claim of default by statement of insolvency.

*Default by Failure to Pay* [10]

Defendant made no payment on the Base Purchase Price in February and May, 1977.[11]

\* \* \* \* \* \*

(b) . . . As additional security to Seller, during the period ending with the last payment of the Base Purchase Price plus interest as provided in paragraph 2, or the death of the Seller, whichever first occurs, the Buyer will cause the Company to have a six-man Board of Directors, three of whom will be elected from among those nominated by Seller. . . .

10. The controversy over the 1977 payments arose while this action was pending. Plaintiff effectively controlled the operation and activities of Reports from the time the Agreement was executed to the present: an employment contract under which plaintiff served as chief executive officer of Reports expired on December 31, 1976, but plaintiff continued to function as chief executive officer thereafter. Under the Agreement three of Reports' six directors were designated by plaintiff to serve until the last payment of the Base Purchase Price plus interest under paragraph 2 of the Agreement, or until plaintiff's death, whichever first occurred:

11. Security for Buyer's Performance.

11. Plaintiff claims that defendant is liable for default on the Note due to its failure to tender to plaintiff payments due February 1, 1977 and May 1, 1977. Defendant counters by claiming that plaintiff, by wrongful acts, has forfeited

Pertinent portions of Section 11 of the Agreement provide:

[Until the Buyer [defendant] makes the last payment of the purchase price to Seller (plaintiff)] Buyer may do any or all of the following and the Seller shall, upon request of the Buyer, take any requisite action necessary to acquiesce in such request:

(a) Cause the Company [Reports] to pay, directly, or borrow from the Company or borrow from another party using or pledging the Company's assets as security, or cause the Company to distribute to Buyer any sum required to pay Seller any portion of the purchase price or interest due on the unpaid balance thereof or any broker's commission or fee as provided.

. . .

Plaintiff claimed in 1977 that he could not distribute money to defendant because the By-Laws of Reports prohibited declaration of dividends in the absence of a surplus, and there was no surplus in February 1977.[12]

Plaintiff's characterization of the ultimate request for distribution as a request for a dividend does not comport with the evidence. Initially defendant requested a distribution in the form of a dividend; plaintiff would agree to distribution only in the form of a loan. However, on February 8, 1979,[13] defendant suggested a solution in a letter to plaintiff:

[W]e are prepared to stipulate that the ultimate legal characterization of the distribution [i. e. whether a dividend or an advance] be deferred until a conclusive legal determination can be made. In the meantime, the distribution of the funds can be made immediately.

(brackets in original). The same offer was made to plaintiff by defendant on February 15, 1977. Plaintiff's refusal to make the requested distribution to defendant cannot be legitimated on the basis that the distribution required the declaration of an illegal dividend. Plaintiff effectively refused to make any distribution, and plaintiff thereby breached the Agreement.

Because plaintiff breached the Agreement, defendant is excused from its corresponding obligation regarding the February payment. *See* 10 *N.Y. Juris., Contracts* § 379 at 371 and cases cited therein (1960).

Moreover, on the credible evidence before me, I find that plaintiff acted in bad faith. Defendant is excused from making any further payments to plaintiff. *See Royce v. Rymkevitch*, 29 A.D.2d 1029, 289 N.Y.S.2d 598, 601 (1968) ("It is well known that where one party [plaintiff] refuses to abide by the contract, and that refusal is not justified by the actions of the other party [defendant], the other party does not have a duty to continue his performance under that contract. (*Restatement, Contracts* §§ 266–90).").[14]

I find the other claims raised by plaintiff to be without merit, and I reject them.

## VI

Defendant is entitled, under the law of the State of New York, to the injunction

---

his right to the payments. "When a defendant is sued for an alleged nonperformance, he defends by asserting that his duty has been 'discharged' . . . by the plaintiff's own breach. . . ." 5A *Corbin on Contracts* § 1229 at 508 (1964). Specifically, defendant claims that it would have tendered the installments if Reports had distributed an equal amount to defendant, but that plaintiff failed to acquiesce in such distribution by Reports, thereby breaching his obligation under Section 11 of the Agreement. Plaintiff responds that distribution by plaintiff to defendants by declaration of a dividend to defendants would have been illegal.

12. There was in fact a modest surplus as of the end of 1976.

13. The payment by defendant to plaintiff was due February 1, 1977, except that the Note, paragraph 3(a)(i), provided for a 15 day grace period. During that period, defendant and plaintiff were still haggling over defendant's request for a distribution.

14. However, "[i]t is not meant by this that the contractual duty of the plaintiff has also been discharged; indeed, the defendant may insist that the plaintiff is still bound to proceed with performance, may ask for specific enforcement, or may counterclaim for damages for either a partial or a total breach." 5A *Corbin on Contracts* § 1229 at 508–09 (1964).

set forth, *supra* in Section I. *See Grad v. Roberts,* 14 N.Y.2d 70, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964); *Pernet v. Peabody Engineering Corporation,* 20 A.D.2d 781, 248 N.Y.S.2d 132, 135 (1964) ("It is implied that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, . . .") (quoting 10 *N.Y.Jur., Contracts* § 203).

Submit judgment on notice.

SO ORDERED.