**UNITED STATES of America, Plaintiff,**

**v.**

**WALLACE & WALLACE FUEL OIL CO., INC., et al., Defendants.**

**No. 81 Civ. 0869 (KTD).**

United States District Court,
S. D. New York.

May 19, 1982.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for plaintiff; Thomas D. Warren, Asst. U. S. Atty., New York City, of counsel.

Cowan, Liebowitz & Latman, P. C., New York City, for defendants; Marvin S. Cowan, J. Christopher Jensen, Louis S. Ederer, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

The United States Government moves for summary judgment to enforce the acceleration clause of a debt agreement entered into between the Small Business Administration and the defendants Wallace & Wallace Fuel Oil Co., Inc. ("Wallace Fuel"), Wallace & Wallace Enterprises, Inc., Westbank Energy Co., Inc., Chaswell Realty Co., Inc. and Charles and Juanita Wallace individually. The defendants cross move for summary judgment contending, *inter alia*, that the plaintiff's improper demand for interest payments under the debt agreement relieves the defendants of their repayment obligations. The agreement entered into between the parties is explicit and unequivocal. Despite defendants' arguments to the contrary, the government has estab-

lished the Wallace defendants' default and is thus entitled to accelerate the loans. Accordingly, plaintiff's summary judgment motion is granted.

## BACKGROUND

The Small Business Administration ("SBA") is empowered, pursuant to Section 2[8](a) of the Small Business Act, 15 U.S.C. § 637(a), to enter into procurement contracts with agencies of the United States Government. Section 8(a) further provides that subcontracts for the performance of the procurement obligations shall be awarded to "socially and economically disadvantaged small business concerns . . . ." 15 U.S.C. § 637(a)(1), (c). This SBA administered program was "to provide minority businesses with an opportunity to contract with the Government." S.Rep.No.974, 96th Cong., 2d Sess. 2, reprinted in [1980] U.S. Code Cong. & Ad.News, 4953, 4954. Wallace Fuel, a black-owned oil concern, qualified for participation in the Section 8(a) program and beginning in 1970 was awarded subcontracts to supply fuel and heating oil to certain agencies of the United States Government, particularly the Defense Department. The price paid by the Defense Department to Wallace Fuel was negotiated by the SBA and at times resulted in losses to Wallace when the market price of oil exceeded the contract price. Affidavit of Charles Wallace, ¶ 9.

Two of the 8(a) subcontracts entered into by Wallace Fuel provided for advance payments to assist the defendants in meeting their financial obligations. In conjunction with the 1976–77 8(a) subcontract, the parties separately executed a modification agreement providing, as amended on March 9, 1977, for an advance by the SBA to Wallace Fuel of five million dollars. The money was placed in a Special Bank Account pending approval of its disbursement by the SBA. In addition, the agreement included a liquidation schedule to end in September, 1977. Matthews Exhibit 1. Another advance payment modification agreement was entered into with respect to the 1977–78 8(a) subcontracts. This contract provided for a disbursement of eight million dollars under the same terms and conditions as the last advance payment contract except that the liquidation schedule ended in September, 1978. Matthews Exhibit 2. These advance payments were issued at a time when the Congressional Small Business Committee felt:

It is imperative that the number of contracts and the dollar volume of awards to minority small businesses under the 8(a) program be significantly increased if minority small businesses are to have the maximum practical opportunity to develop into viable small businesses.

S.Rep.No.974, 96th Cong., 2d Sess., 2, reprinted in [1980] U.S.Code Cong. & Ad. News, 4953, 4954.

By August of 1978, the SBA had advanced Wallace Fuel $13 million and only $2.8 million had been repaid, leaving at total balance due of $10.2 million. The modification agreements, under which the money was extended to Wallace Fuel, contained provisions for the payment of any deficiency upon written demand by the SBA. In an attempt to avoid the harsh result of requiring immediate repayment, a Debt Structure Agreement ("DSA") was executed on August 9, 1978. Matthews Exhibit 3. This agreement between the SBA and Wallace Fuel recognized Wallace Fuel's present inability to repay its advances and devised a restructuring of the debt to "assist Fuel Oil Company in the performance of its 1977–78 8(a) Contract, potential 8(a) contracts with the SBA and in becoming a competitively viable operating oil marketing company." Id. at p. 2. The DSA also stated that although the SBA is not obligating itself "to any further 8(a) contracts, other assistance, or other agreements of any kind" id. (emphasis added), the SBA would exert its best efforts in facilitating Wallace Fuel's economic recovery. The instrument provided for repayment by Wallace Fuel of its entire 8(a) debt of $10.2 million. The DSA represented the "entire understanding" of the parties, id. at p. 14, and was only subject to amendment, modification, cancellation or discharge upon a supplemental written agreement by all par-

ties. Section 4 of the DSA set forth a minimum monthly payment schedule of either a percent royalty on oil contracts or a minimum payment of accrued interest on the outstanding 8(a) debt plus $35,000 to amortize the principal, whichever was greater.[1] Section 6 of the DSA provided for acceleration of the entire 8(a) debt upon written demand of the SBA whenever Wallace Fuel failed to make Section 4 payments "promptly as they become due and payable." *Id.* at p. 8.

On August 9, 1978, the same day the DSA was executed, the defendants released the SBA, in writing, from all potential claims arising up until the date of this release. Matthews Exhibit 5. All the defendants, except Wallace Fuel, also executed guaranties and promissory notes on this date for the payment of Wallace's debt. Wallace Fuel's execution of the DSA rendered its signing of further guaranties unnecessary. Matthews Exhibits 6, 7. The defendants were represented at all times throughout the negotiation and execution of the release by Stroock, Stroock & Lavan. On August 9, 1978 this law firm submitted an opinion letter recognizing that "the Debt Structure Agreement has been duly and validly executed and is a valid, binding and enforceable obligation of each [Wallace] Company in accordance with its terms." Matthews Exhibit 8, at p. 2.

Representatives of the parties met again in the summer of 1979 in the SBA's Washington headquarters to discuss the mounting deficits under the DSA and to formulate feasible alternatives for repayment of the Wallace debt. The meeting was attended by Mr. Mauk, Deputy Administrator of the SBA, Mr. Irizarry, SBA New York Regional Administrator, Mr. Matthews, SBA New York Regional Counsel, the Wallace representatives and its attorneys, Stroock, Stroock & Lavan, and two outside consultants hired by the SBA: Milgrim, Thomajan & Jacobs, a law firm hired to draft a Debt Structure Modification Agreement

("DSMA") and John Trask, a consultant hired to help implement the new DSMA. The parties understood at that time that Wallace Fuel could not repay its outstanding debt according to the DSA terms and that Wallace Fuel had in fact incurred losses on ground fuel contracts executed under the 1977–78 agreement. As Mr. Trask testified in a deposition:

> I remember it as being quite a complicated period. I can't quite remember when the Iranian crisis was, but as I recall there was some upheaval in the oil industry at the time, and one of the factors which had become clear was that at the latter part of his contract Mr. Wallace was delivering product under contract at a loss.

Trask Deposition, at p. 15. The negotiations between the parties resulted in a DSMA which was duly executed on January 4, 1980 and provided for a moratorium on the minimum monthly and interest payments agreed to in the DSA. The DSMA expired on September 30, 1980 at which time the DSA provisions were automatically reinstated. The purpose of this "moratorium year" was to give Mr. Wallace: "This one year to demonstrate what he could do, and depending on what he could do, depending on his ability, he either would or would not be able to pay the debt, continue with the debt structure agreement." Trask Deposition, at p. 70. The DSMA (i) halved the defendants' royalty payments for non crude oil petroleum, (ii) amended the total 8(a) debt to its then current figure of approximately $11.8 million, (iii) provided for acceleration upon default and (iv) specifically states that all provisions of the DSA not modified by the DSMA remain in effect. On January 4, 1980, the defendants, except Wallace Fuel, extended the guaranties and promissory notes applicable to the DSA to cover the modification agreement. Again, Wallace Fuel's execution of the DSMA made further commitments superfluous.

---

1. This schedule only applied to months when Wallace Fuel was performing 8(a) contracts. When no 8(a) contracts were being executed in a given month, Wallace Fuel was obligated to make payments "sufficient to fully amortize the 8(a) Debt by June 30, 1993." Matthews Exhibit 3, at p. 6.

The defendants were counselled by Stroock, Stroock & Lavan throughout the negotiation and execution of the DSMA.

The promissory note executed on January 4, 1980, Matthews Exhibit 10, provided for payment by Wallace Fuel of the balance remaining in their special SBA account from the 1978–79 8(a) contracts. Pursuant to this note, a check was tendered on January 9, 1980 to the SBA in the sum of $1,248,440.38. Benjamin Affidavit, ¶ 9. The note specially stated that all payments are first to be applied to interest and the remainder will be applied to reduce the outstanding principal. Accordingly, $195,062.86 was applied to cover all interest accrued between October 1, 1979 and January 9, 1980 and the remaining $1,053,377.52 was applied to reduce the Wallace Fuel indebtedness from $11,821,755.30 to $10,768,377.78. Declaration of James Gonyo, ¶ 3.

No payments were made by Wallace Fuel during the life span of the DSMA. The SBA made repeated requests for information regarding petroleum products delivered by Wallace Fuel pursuant to its 8(a) contracts in order to calculate royalties owed. Wallace Fuel's financial statements finally submitted on June 3, 1980 reflect a total sale of over 18 million gallons [2] of petroleum from October 1, 1979, the effective date of the DSMA, through March 1, 1980. Wallace Fuel affirmed its obligation to pay royalties on these sales in a letter written by Stroock, Stroock & Lavan on July 31, 1980. On September 25, 1980, Mr. Irizarry notified Mr. Wallace of the likelihood of acceleration of the debt if the requisite payments were not tendered. Two checks, totalling $113,839.99, the royalties accrued from October 1 through March 1, were sent to the SBA on October 17, 1980. One of the checks,[3] written in the sum of $105,101.86, was never honored by the defendants' bank.

On November 14, 1980, Mr. Irizarry again wrote Mr. Wallace. Matthews Exhibit 19. This letter demanded that Wallace Fuel remit to the SBA within ten days interest payments which were suspended during the moratorium year until September 30, 1980. Pursuant to Section 4.2 of the DSA, Wallace Fuel was obligated to tender a minimum payment of accrued interest on the entire balance of its 8(a) debt equaling $522,276.78, plus an additional $35,000 to arrive at a total of $557,276.78. The SBA subtracted the amount reflected on the October 17, 1980 check and demanded $452,174.92. Wallace Fuel disputed the SBA's interpretation of the DSA, as evidenced by the November 20, 1980 letter of Stroock, Stroock & Lavan, Matthews Exhibit 20, and requested that the demand be withdrawn. No payment has since been forthcoming from Wallace Fuel.[4]

The SBA notified the defendants of its default under the DSA on December 10, 1980 and again on January 6, 1981. On February 13, 1981 this action was initiated demanding the principal amount of $10,768,377.78 plus interest. The defendants answered on June 12, 1981 and raised eighteen affirmative defenses. After limited discovery,[5] the plaintiff moved for summary judgment based entirely on the DSA and its explicit obligations. The defendants opposed the plaintiff's motion and alternatively cross-moved for summary judgment.

## DISCUSSION

A motion for summary judgment is appropriate when no genuine issues of fact

---

2. Check No. 6993, Matthews Exhibit 17, computes royalties from the sale of in excess of 22 million gallons. This discrepancy remains unexplained.

3. The smaller check was paid to the order of Wallace Fuel and was not endorsed. This check was returned for proper endorsement.

4. In late January, 1981, Wallace Fuel replaced the smaller check discussed in footnote 3, *supra*.

5. Plaintiff includes in its motion papers a stay of discovery pending the outcome of this motion. Defendants oppose this motion. Discovery was permitted to cover negotiations for both the DSA and the DSMA. *See* Minutes of August 5, 1981. Defendants maintain that pre-1978 discovery is needed to resolve the instant motion. Resolution of this discovery problem is dealt with *infra*.

are present. Fed.R.Civ.P. 56(c). The burden rests on the moving party to establish the absence of material disputed facts warranting a trial on the merits. *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir. 1981). Addressing the government's summary judgment motion first, it relies entirely on the executed DSA and DSMA between the parties. The defendants do not dispute the validity of these instruments or the veracity of any of the facts recited above, but instead urge this court to go beyond the four corners of the instrument to ascertain through parol evidence the unstated terms and conditions implicitly contained in the debt structure agreements which purportedly exonerate defendants. The plaintiff vigorously opposes the admission of parol evidence and contends as a matter of law that the defendants are bound to the contractual terms, that the parol evidence rule precludes examination of the behind-the-scene negotiations before, during and after the execution of the instruments and that no genuine issue of fact remains. The SBA insists that the defendants' acknowledgment of their debt in both the DSA and the DSMA when viewed in conjunction with their continued refusal to comply with the terms of either agreement merits summary judgment.

If any of the eighteen affirmative defenses proffered by the defendants in opposition to the plaintiff's summary judgment motion raises a genuine factual issue, summary judgment is inappropriate. To defeat plaintiff's summary judgment motion defendants must present facts to support each of their affirmative defenses.

██ The heart of the defendants' opposition to summary judgment rests on their attempt to introduce extrinsic evidence manifesting the SBA's commitment to Wallace Fuel's economic revival. However, it is well settled that the terms of a validly executed contract control absent evidence manifesting ambiguity or lack of clarity. *See Tokio Marine and Fire Insurance Co. Ltd. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir. 1980); *Neuman v. Pike,* 591

F.2d 191, 193 (2d Cir. 1979). The parol evidence rule operates to preclude the admission of extrinsic evidence outside the four corners of a contract whenever the contract is "complete, unambiguous, and valid, or there is no fraud, accident or mistake, or claim or allegation thereof, with respect to the instrument." 32A C.J.S. Evidence § 851 at 214–15 (1964); *See* 3 A. Corbin, Contracts § 573 (1960). This rule was developed to safeguard the sanctity of integrated writings from future attempts at contradiction. 3 A. Corbin, Contracts § 5726 (1960 & 1980 Supp.).

Defendants allege that the contracts in question are unintegrated and ambiguous, *inter alia,* and therefore call for application of the parol evidence rule. The defendants argue that the government agreed to abide by certain "conditions" not expressly contained in the DSA and DSMA which provided the foundation for agreement among the parties. The conditions purportedly agreed to by the SBA are as follows: (1) continuation of the defendants in the 8(a) program in conjunction with the grant of future 8(a) contracts; (2) delivery and acceptance by the Defense Department of $11 million dollars worth of fuel; (3) the award of year long 8(a) contracts; (4) financing of all future 8(a) contracts through the Treasury Department line-of-credit method; (5) disbursement of $5.5 million in advance payments to Wallace Fuel under its 1978–79 ground fuels contract; (6) award of profitable bulk and crude oil 8(a) contracts and (7) award of all contracts at a fair market price.

The defendants concede that none of these obligations are set forth in the instruments. They assert, however, that the written agreements are too ambiguous and incomplete to reflect the true intentions of the parties and therefore parol evidence should be admitted.

## I. *Integration*

██ In determining whether the parol evidence rule applies to this case the first issue to be resolved is whether the written contract between the parties was integrat-

ed, i.e. whether the DSA and the DSMA represent a complete and accurate understanding of the parties. When the contract as signed represents the complete and accurate understanding of the parties, parol evidence is inadmissible to vary or modify the terms of the writing. *Battery Steamship Corp. v. Refineria Panama, S. A.*, 513 F.2d 735, 738 (2d Cir. 1975); *APLications, Inc. v. Hewlett-Packard Co.*, 501 F.Supp. 129, 132 (S.D.N.Y.1980).

■ The DSA contains the following integration clause: "This Agreement . . . contains the entire understanding of the parties hereto . . . . There are no restrictions, promises, warranties, convenants or undertakings, other than those expressly set forth herein or therein." Matthews Exhibit 3, Section 14 at p. 15. This clause is not modified by the DSMA and refutes the defendants' contention that the DSA was unintegrated.[6]

The defendants entered into this agreement with the aid of sophisticated counsel. To now allow the Wallace defendants to attack the contract as incomplete two years after its execution strikes at the core of the parol evidence rule which protects written contracts from later self-serving modifications distorted by time.

Defendants concede that multiple drafts of both the DSA and the DSMA were circulated prior to final execution and that the defendants were involved in all the drafts. No facts suggest that the contracts are incomplete, except for the defendants' eleventh hour attempt to evade its conditions.

The conditions that the defendants attempt to introduce through the parol evidence rule are directly contradicted by the express terms of the agreement. First, Section 4.4 makes provisions for payments to the SBA even if Wallace Fuel does not participate in the 8(a) program. This is inconsistent with the defendants' allegation that the SBA was obligated to continue providing the 8(a) contracts to the defend-

ants. Secondly, the recital section of the DSA specifically states that "This agreement does not commit SBA to any further 8(a) contracts, other assistance, or other agreements of any kind." Matthews Exhibit 3. The parties agree that this clause was the subject of extensive discussion. The plain language arrived at, however, speaks for itself and will not be upset by defendants' contentions that a contradictory meaning was intended. To allow the material alteration sought by the Wallace parties: ". . . [would] eviscerate the parol evidence rule, 'whose very purpose and essence . . . is to avoid fraud that might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning' of the agreement." *Meinrath v. Singer Co.*, 482 F.Supp. 457, 461 (S.D.N.Y. 1979), *quoting Eskimo Pie Corp. v. Whitelawn Dairies*, 284 F.Supp. 987, 993 (S.D.N.Y. 1968). Thus, in light of the DSA's integration clause and the evidence sought to be admitted by the defendants contradicting the terms of the DSA and the DSMA, the DSA and the DSMA are deemed integrated.

II. *Ambiguity*

■ Despite the contract's integration, parol evidence may be properly admitted if the contract in question is ambiguous, either in part or in whole. 3 A. Corbin, Contracts § 579 (1960 & 1980 Supp.); *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp., supra*, 617 F.2d at 940. The defendants contend that the ambiguity of the DSA's "best efforts" clause opens the door to extrinsic evidence. The clause in question reads:

Pursuant to its regular procedures, as long as Fuel Oil Company remains in the 8(a) Program, SBA will use its *best efforts* to assist in securing subcontracting opportunities in support of Fuel Oil Company's approved business plan.

Matthews Exhibit 3 (emphasis added).

■ The defendants' argue that the best efforts clause implies that the SBA obligat-

---

**6.** The DSMA is a modification of the DSA. Therefore, if the DSMA, which incorporates the DSA, is deemed integrated, then the DSA is also a complete document. The DSMA does not include an integration clause. Its waiver clause, however, provides that in the absence of specific modifications, the DSA "shall continue in full force and effect." Matthews Exhibit 9, Section V. Accordingly, the DSA's integration clause controls both contracts.

ed itself to provide future 8(a) contracts. This interpretation, however, is directly refuted by the sentence preceding the best efforts clause: "This Agreement does not commit SBA to any further 8(a) contracts, other assistance, or other agreements of any kind." *Id.* Defendants' reliance on *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) for the proposition that a best efforts clause is inherently ambiguous is unpersuasive. First of all, the *Lipsky* case revolved around a motion to dismiss and not a summary judgment motion. Secondly, the Second Circuit examined the best efforts clause in the contract before them and did not endorse a blanket denunciation of best effort clauses.

No ambiguity is presented in the instant best efforts clause. The clause is not a guarantee and this court will not allow the Wallace parties to introduce extrinsic evidence attempting to prove that the parties really intended to commit the SBA to future 8(a) contracts. The clause plainly sets forth the SBA's obligation to assist Wallace Fuel in its future endeavors and absent ambiguity this court will not permit the Wallace parties to sidestep this language.[7]

### III. *"Failure of Condition" Defenses*

Notwithstanding the integration and clarity of the DSA, the defendants continue to press for the admission of parol evidence. The defendants' affirmative defenses of failure of consideration, failure to perform conditions precedent, impossibility of performance, prevention of performance, negligent misrepresentation and mutual mistake of fact all rely on the failure of the SBA to comply with the allegedly implicit conditions contained in the DSA. Each "failure of condition" defense is scrutinized below in order to determine if extrinsic evidence supposedly documenting the existence of these conditions is admissible. Absent evidence, the defenses lack a substantiated factual foundation and do not raise material factual issues to defeat the plaintiff's summary judgment motion.

### 1. *Condition Precedent*

■ The defendants argue that the conditions to be performed by the SBA were conditions precedent to the establishment of any contractual duty on the part of the Wallace parties. In effect, the Wallace parties contend that the contracts lack legal validity because the SBA never complied with the unwritten conditions.

The Ninth Circuit has recognized that parol evidence may be introduced to show "that the written contract never became effective because it was contingent upon the happening of some future event." *United States v. Hub City Volkswagen, Inc.*, 625 F.2d 213, 214 (9th Cir. 1980). However, the limitation on the parol evidence rule allowed by the *Volkswagen* court does not include contracts where the extrinsic evidence is inconsistent with the contract. 625 F.2d at 215. Thus, this further attempt to circumvent the plain language of the DSA and DSMA is unsuccessful.

The DSA and DSMA outline the responsibilities of both the SBA and Wallace Fuel and do not condition the effectiveness of the contracts on a future event. Stroock, Stroock & Lavan's recognition of the DSA as "valid, binding and enforceable," Matthews Exhibit 8, in conjunction with their letter of July 31, 1980 reflecting Mr. Wallace's intention to comply with the payment requirements of the DSA, Matthews Exhibit 15, directly undermine the defendants' argument. The integration clause also refutes the condition precedent defense. Section 14, DSA, Matthews Exhibit 3. Thus, this defense does not justify the introduction of the defendants' parol evidence.

---

**7.** Defendants' reliance on *Shiya v. National Committee of Gibran*, 381 F.2d 602 (2d Cir. 1967) and *Bird v. Computer Technology, Inc.*, 364 F.Supp. 1336 (S.D.N.Y.1973) is unsound. Both cases, unlike the instant case, presented patently ambiguous contracts. Furthermore, the *Shiya* court refused to pass on the sugges-

tion that "courts should forthrightly abandon the prerequisite of finding ambiguity before admitting evidence of 'surrounding circumstances.'" 381 F.2d at 607, n.1, *quoting United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302, 309–15 (2d Cir. 1955) (Frank, J., concurring).

### 2. Prevention of Performance

■ The Wallace parties seek relief from their obligations by contending that the SBA's failure to comply with the conditions prevented the defendants from living up to their side of the agreement. In making this argument, the defendants ignore the obvious fact that the contract does not include the contested conditions and that the SBA complied with the stated terms of both the DSA and the DSMA. The defendants counter this argument with their contention that the parol evidence rule is inoperative when faced with the prevention of performance defense and thus, conditions contradicting the contracts should be introduced. The SBA has not violated the DSA or the DSMA. Although the prevention of performance doctrine might excuse a party of its obligations, "this principle has no application when the party whose performance was prevented entered into the contract fully aware of the obstacles which would prevent his performance." *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1371 (5th Cir. 1979), *citing Owens v. William H. Banks Warehouses, Inc.*, 202 F.2d 689, 692 (5th Cir.), *cert. denied*, 346 U.S. 813, 74 S.Ct. 346, 98 L.Ed. 341 (1953). The Wallace parties cannot now contest the feasibility of an executed and binding contract into which they freely entered. This defense will not permit circumvention of the parol evidence rule.

### 3. Want of Consideration

■ The defendants elaborate upon the defense of prevention of performance, discussed above, and now argue that the SBA knew at the time the contracts were entered into that the Wallace parties could never satisfy their obligations without firm commitments by the SBA to provide future 8(a) contracts and other economic incentives. This knowledge, it is argued, deprives the contract of its consideration and renders it invalid. *R. C. Craig Limited v. Ships of the Sea, Inc.*, 345 F.Supp. 1066, 1075 (S.D.Ga.1972). The general rule is that the court will not delve into the adequacy of consideration. *Hoffa v. Fitzsim-*

*mons*, 499 F.Supp. 357, 365 (D.C.D.C.1980). The DSA states that "In consideration of the mutual promises contained herein, the parties agree as follows." Matthews Exhibit 3, at p. 3. This consideration is sufficient to support a valid contract and to disallow extrinsic evidence on the impossibility of performance defense.

### 4. Destruction of Condition

Defendants' continue to argue unsuccessfully that because the DSA was premised on the unstated conditions, the destruction of these conditions by the SBA excuses the defendants from their obligations and allows parol evidence to slide through the seams of the contract. *See Walter E. Heller & Co. v. American Flyers Airline Corp.*, 459 F.2d 896 (2d Cir. 1972). This argument fails for the same reason that the above "failure of condition" defenses fail; this defense is contradicted by the express terms of the contracts in issue. Not only did the best efforts clause not bind the SBA to secure future 8(a) contracts, but also the SBA did not destroy any conditions contained in the DSA or the DSMA. Therefore, the inadequacy of future 8(a) contracts awarded to Wallace Fuel neither destroys a basis of the parties' agreement nor permits extrinsic evidence to support this defense.

### 5. Negligent Misrepresentation

■ Negligent misrepresentation of material facts may constitute ample grounds for admission of parol evidence and may also support a finding of fraud sufficient to justify recision. *See Cortlandt v. E. F. Hutton, Inc.*, 491 F.Supp. 1, 4 (S.D.N.Y.1979). The defendants hope to infuse life into the alleged conditions, by contending that the SBA negligently misrepresented that these conditions would be fulfilled. One important element of negligent misrepresentation on which defendants must make an offer of proof to defeat summary judgment is the defendants' justifiable reliance on the supposed misrepresentation. *United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77, 85 (E.D.N.Y.1975). In light of

the contracts themselves and the defendants' representation by counsel throughout the drafting and rewriting process of their agreements, it is clear that any reliance by the defendants on unexpressed conditions was unjustified. At most, the statements attributed to the SBA spokesmen were opinions and did not rise to the level of actionable fraud. The ability of the SBA to commit itself to the award of profitable crude oil contracts to Wallace Fuel is dependent on forces beyond the SBA's control, for example, the world oil supply, market and demand. When matters beyond the control of the plaintiff form the premise for the misrepresentation and are not expressed in the contract, it is inequitable to avoid the contract on this ground. *See Samuels v. Eleonora Beheer, B. V.*, 500 F.Supp. 1357, 1364 (S.D.N.Y.1980), *aff'd*, 661 F.2d 907 (2d Cir. 1981). Defendants' awareness of the instability of the oil market is reflected by their allegations that they themselves were victims of inflated prices resulting from the Iranian oil crisis. Defendants charge of negligent misrepresentation does not effectively challenge the well settled principle that "In the normal course the execution of . . . [an integrated] agreement bars consideration of parol evidence intended to vary the import of the agreement." *Reimann v. Saturday Evening Post Co.*, 464 F.Supp. 214, 217 (S.D.N.Y.1979).

### 6. Mutual Mistake

■ The mutual mistake defense raised by the defendants suggests that there was no meeting of the minds necessary to effect a binding contract. This defense is not applicable to the instant case where "the risk of the existence of some factor or of the occurrence of some event is consciously considered in agreeing upon terms. There is no mistake; instead, there is awareness of the uncertainty, a conscious ignorance of the future." 3 A. Corbin, Contracts § 598 (1960). The negotiations between the parties, the drafting process and the plain language of the final contracts all militate against a finding of mutual mistake. *See Reimann, supra*, 464 F.Supp. at 219.

In sum, all the failure of condition defenses raised by the defendants are lacking in merit and do not present factual issues sufficient to defeat a summary judgment motion.

### IV. Defendants' Remaining Defenses

### 1. Inadequate Discovery

■ Discovery was limited in scope in this case to the negotiation period for both the DSA and the DSMA. *See* Minutes of August 5, 1981. The defendants contend that this limitation has precluded the discovery of information necessary to support their affirmative defenses of duress, undue economic control, and violation by the SBA of its own regulations.

Fed.R.Civ.P. 56(f) provides that when a party opposing a motion

. . . cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

If in fact, the defendants are incapable of documenting their opposition because of the discovery restrictions then judgment may not be imposed against them. However, Rule 56(f) is subject to the limitation that the information sought is "within the control of his adversaries." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Thus, each claim the defendants raise for more discovery must be scrutinized to see if the defendants control the documents in question or if the documents are relevant to the issues.

### A. Duress

The defendants contend that the execution of the DSA, the DSMA and the releases, guaranties and notes thereunder resulted from economic duress exerted by the SBA. Any documents in support of the defendants' economic duress claim would necessarily be in the possession of the Wal-

lace parties. The documents submitted by the SBA *in camera* are not relevant to the issue of duress and need not be made available to the defendants. Without more than vague accusations supporting this defense, no further discovery will be allowed.

An essential element of "business compulsion" duress is that the defendants' actions "were precipitated solely by duress and without hope of personal gain." *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 644 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979). The personal gain accruing to the defendants from the contracts is obvious. Not only were the defendants granted a one year moratorium on repayment of their outstanding loan but they also were allowed to renegotiate their obligations twice to arrange a reasonable repayment schedule.

The alleged "threats" by the SBA of a ten million dollar lawsuit and a pending criminal investigation were not wrongful threats. These threatened actions were well within the bounds of the contracts and as such do not constitute duress. *See United States v. Bedford Associates*, 657 F.2d 1300, 1308 (2d Cir. 1981); *Business Incentives Co., Inc. v. Sony Corp. of America*, 397 F.Supp. 63, 69 (S.D.N.Y.1975). In addition, it seems incongruous for the defendants on the one hand to allege economic duress by the SBA and on the other hand to hire sophisticated counsel to assist them and to protect their rights in the negotiation and drafting process.

### B. Economic Control

This defense claims that the undue economic control exercised by the SBA over the finances of Wallace Fuel converts the SBA into a joint venturer who must bear the losses by its co-venturer. This defense includes an allegation that the SBA had a fiduciary obligation not to enforce the terms of the contract and accelerate the debt. These defenses do not merit further discovery. There is no evidence nor any offer of proof as to evidence which will support this excessive interference or fiduciary obligation claim. Any control or obli-

gation created by the DSA or DSMA was expressly agreed to by the defendants. Any management of funds by the SBA was part and parcel of the loan agreement. Furthermore, the release signed by the Wallace parties expressly waives defenses against the SBA and the United States based on the DSA or the DSMA up until the date of the release, August 9, 1978. Matthews Exhibit 5. The purported control by the SBA which resulted in the $10 million debt due today was exerted before this date and thereby precludes the assertion of these defenses.

### C. Violation of SBA Regulations

Based on the affidavit of Louis Ederer, a member of the law firm representing the defendants in this action, defendants allege that the SBA violations of its own regulations requires further discovery to uncover the extent of these violations. Neither of the exhibits attached to the Ederer affidavit, however, support any allegation of wrongdoing by the SBA. The SBA has defended its interpretation of the regulations and not admitted transgressions. These exhibits do not justify an opening of all the SBA books and records when the bottom line will not be changed; the DSA and DSMA are legally enforceable documents obligating the defendants to repay substantial sums of money.

In sum, none of the reasons given by the defendants to extend the discovery restrictions are valid. It does not appear that the plaintiff controls documents relevant to defendants' defenses or that the defenses are meritorious. Accordingly, further discovery is denied.

### 2. *Improper Demand*

■ On November 14, 1980 the SBA demanded that Wallace Fuel remit $35,000 plus interest accrued during the moratorium year to satisfy its obligations under the DSA. The defendants respond that the impropriety of this demand constituted a breach of the DSA and excused the defendants' performance under the contract. It is the defendants' contention that because the

SBA's interpretation of the DSA would render performance impossible, that interpretation must therefore be incorrect. I have already ruled that no parol evidence on the issue of impossibility of performance is admissable. The parties are thus bound by the plain language of the agreement.

The DSMA specifically stated that after its expiration, the terms of the DSA will automatically take effect. Matthews Exhibit 9, Section 1. The DSA in turn provides that if Wallace Fuel participates in 8(a) contracts, which it did, then it is to transmit a "minimum payment, equal to the sum of (i) accrued interest on the unpaid balance of the 8(a) Debt and (ii) $35,000 to amortize the unpaid principal." Matthews Exhibit 3, Section 4.22. No upward limits of accrued interest are found in the DSA.

The defendants argue that approximately $1 million of their payment of $1.2 million in January, 1980 to the SBA was wrongly applied to outstanding principal rather than to accrued interest. However, as stated in the facts, the payment was properly applied to satisfy all interest owed at that time. In addition, the defendants contend that the parties agreed that the interest amassed during the moratorium year would be added to the principal and amortized over the life of the debt. This interpretation, supported by the deposition of Mr. Jacobs, at pp. 199–200, is not, however, supported by the DSA. It is interesting to note that the defendants contested the amount demanded by the SBA, and recognized that non-payment could result in acceleration of the debt, yet no payments were forthcoming, not even for the amount owing according to the Wallace Fuel interpretation of the interest clause. The SBA demand in November, 1980, that the interest payment of approximately $450,000 be paid forthwith was in accordance with the DSA's terms. The defendants' efforts to contradict the explicit terms of the contract are unavailing.

Although contracts are generally to be construed against the drafter, *Instruments for Industry, Inc. v. United States*, 496 F.2d 1157, 1161 (2d Cir. 1974), this is not sufficient reason to abandon an explicit agreement on interest payments. Nor is the SBA's demand an anticipatory breach of the DSA. The defendants agreed to pay interest and the SBA properly demanded these payments. The defendants' reliance on *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953 (2d Cir. 1976) on this point is misguided. An anticipatory breach must be predicated upon terms not contained in a contract, 538 F.2d at 955. In this case, the SBA has relied on terms included in the DSA.

The demand by the SBA, the decision by the SBA to hold the defendants in default and the subsequent acceleration of the debt is not unconscionable. Enforcement of a contract executed at arm's length between sophisticated parties is required to maintain the integrity of the 8(a) program.

The defendants' remaining defenses of illegality, ultra vires and waiver and estoppel, are all meritless and can be summarily dismissed. The defendants' dilatory attempts to void the contract and thus their obligations are ineffectual.[8]

After a thorough examination of the defendants' arguments, no material issues of fact exist to deny the SBA's summary judgment motion. The DSA and the DSMA were entered into with open eyes by all parties and are not now subject to disavowal. Thus, the only remaining issue is the plaintiff's motion to dismiss the defendants' counterclaims.

### V. *Counterclaims*

 The SBA moved to dismiss the defendants' six remaining counterclaims.[9] Counterclaims against the United States are precluded by the doctrine of sovereign immunity unless the action seeks recoup-

---

**8.** The SBA has not waived its rights to proceed under the DSA. The SBA's attempts to procure owed money from the defendants without resort to litigation cannot now be used by the defendants to prejudice the SBA.

**9.** Three of the nine defendants' counterclaims are affirmative defenses and as such are disposed of by an entry of summary judgment in favor of the SBA.

ment against the government and not an affirmative recovery, or the counterclaims arise out of the same transaction or occurrence. 3 J. Moore, Federal Practice, ¶ 13.02, n.1 (2d ed. 1981). The defendants allege that their remaining counterclaims arise out of the same transaction as the government's claims. In response, the government argues that the counterclaims are all based on alleged breaches of 8(a) subcontracts and are not part of the instant case which relates solely to the failure to the defendants to tender payments under the DSA and the DSMA. Furthermore, the government argues that execution of a release from all defenses by the Wallace parties bars the assertion of four of the six counterclaims.

The defendants concede execution of a release, but argue that if this court refuses to uphold the DSA the release executed thereunder will be unenforceable. Summary judgment is granted validating the legal viability of the DSA. Thus, the release clause also remains in effect. The release was executed on August 9, 1978. Therefore, three of the defendants' counterclaims and part of a fourth [10] are barred by the release as having arisen prior to the time of execution.

It still must be determined if the remaining counterclaims are part and parcel of the government's actions. These counterclaims revolve around the failure of the SBA to pay Business Development Expenses purportedly due and owing in connection with the 8(a) contracts. The defendants assert that the "logical relationship" between the 8(a) contracts and the debt to the SBA fits within the "recoupment" exception to the sovereign immunity rule. See United States Use of D'Agostino Excavators, Inc. v. Heyward-Robinson Co., 430 F.2d 1077, 1081 (2d Cir. 1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). This argument is un-

persuasive. The 8(a) contracts are separate, independent contracts unrelated to the DSA and DSMA. While the ongoing relationship between the Wallace parties and the SBA resulted in all contracts between the parties, this relationship is not sufficient to "inextricably intertwine" the counterclaims and the original complaint. Meinrath v. Singer Company, 87 F.R.D. 422, 432 (S.D.N.Y.1980). The Business Development Expenses that the defendants allege are owed are not included within the terms of either the DSA or the DSMA. Therefore, the limited exception to the shield of sovereign immunity will not be disturbed. This court lacks subject matter jurisdiction over the defendants' remaining counterclaims. Thus, all the counterclaims are dismissed.[11]

## CONCLUSION

The defendants have attempted through extensive briefing to refute their obligations to repay the SBA. The affirmative defenses, counterclaims and legal arguments cannot erase the explicit terms and conditions of the DSA and the DSMA nor mask the underlying debt of the Wallace parties. The defendants' failure to persuasively refute the plain language of the agreement warrants enforcement of the DSA as agreed upon by all the parties. I appreciate the repercussions of this decision that will fall on the defendants' shoulders. These considerations, however, do not justify abandonment of legal precedent and principle. The 8(a) program was enacted to encourage minority businesses, but it was not intended to provide singular treatment to its participants when contractual rights were violated.

In sum, the plaintiff's motion for summary judgment is granted, the defendants' cross-motion for summary judgment is denied and the defendants' counterclaims are

---

10. The fifth counterclaim alleges that the SBA failed to pay owed Business Development Expense during the period 1975–79. Recovery for the injury allegedly resulting after August 9, 1978 is not precluded by the release.

11. Once the counterclaims are deemed violative of the sovereign immunity doctrine, jurisdiction over these counterclaims rests exclusively with the Court of Claims. See 28 U.S.C. § 1346(a)(2) (1981).

dismissed.[12] Settle judgment on notice within twenty days of the date hereof.

12. Plaintiff's request for a stay of discovery pending resolution of this motion is mooted by this decision.