**UNITED STATES of America**

v.

**Lee ISENBERG, Lee Isenberg Associates Training Services, Lee Isenberg Associates, Inc., New Horizons Developments, Inc., Marian Isenberg, and Edward Isenberg.**

Civ. A. No. H–83–567.

United States District Court,
D. Connecticut.

May 29, 1986.

Gary M. Black, Dept. of Justice, Washington, D.C., for plaintiff.

James A. Wade, Robinson & Cole, Hartford, Conn., for defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT OR DISMISSAL OF DEFENDANTS' COUNTERCLAIMS

CLARIE, Senior District Judge.

In this civil action under the False Claims Act the United States has moved to dismiss certain special defenses raised by the defendants. The Court finds that the challenged "special defenses" are actually counterclaims and that five of them and part of a sixth must be dismissed because the doctrine of sovereign immunity deprives the Court of jurisdiction over the

subject matter. A seventh counterclaim fails to state a claim upon which relief can be granted. Finally, the Court concludes that in light of the existence of a genuine issue of material facrt, the plaintiff's motion for summary judgment on an eighth counterclaim should be denied.

*Facts*

This is an action brought by the United States under the False Claims Act, 31 U.S.C. §§ 3729–3731. The defendant, Lee Isenberg, was convicted on November 20, 1981 of defrauding the United States government of funds from its subsidized employment training program, CETA (Comprehensive Employment Training Act), in violation of 18 U.S.C. §§ 371, 665 and 1001. The instant civil action was filed on June 30, 1983 and named as defendants Lee Isenberg, Lee Isenberg Associates Training Services (LIATS), Lee Isenberg Associates, Inc. (LIA), New Horizons Developments, Inc. (NHD), Marian Isenberg, and Edward Isenberg. The first count of the complaint, directed to Lee Isenberg and LIA, alleges that between October 21, 1975 and 1979, Lee Isenberg misrepresented and inflated to CETA prime sponsors the value of services furnished to certain corporations within his control by fourteen individuals who were paid for their services from CETA funds. Counts II and III, which also name Lee Isenberg and LIA, identify as alternative bases for relief actions for deceit and for "the recoupment of public funds paid by mistake." Count IV, a claim for unjust enrichment, is addressed to all defendants.

On June 10, 1985, several of the defendants (all those except Edward Isenberg) filed their answer and raised a "special defense":

1. The gravamen of the plaintiff's four count complaint is that between October 21, 1975 and 1979, fourteen individuals employed by Lee Isenberg Associates were paid, in whole or in part, for services they performed for Lee Isenberg Associates with CETA funds and that as a result thereof, false statements were made and fraudulent claims paid by and to these defendants.

3.[sic] Even assuming that the allegations made by plaintiff are true, and funds were improperly paid to Lee Isenberg Associates employees, these defendants cannot be held liable to plaintiffs for payment or reimbursement of those sums because plaintiff benefitted through the deposit of surplus funds into the CETA accounts, to which funds the consortiums had no right, title or interest, in an amount equal to or greater than the amount of funds allegedly mispaid to Lee Isenberg Associates employees, in one or more of the following ways:

a. A settlement with the Department of Labor resulted in $49,000 being deposited into the CETA accounts by Ralph Cardone in 1973.

b. Additional government funds were recaptured, as the result of the settlement of audits and claims, in the amount of $60,000 in 1971 or 1972, and put in the CETA accounts.

c. Surplus funds were build up under the fixed price contracts and left in the CETA accounts, totalling approximately $150,000.

d. Defendant Lee Isenberg absorbed interest charges on advance money loans made by him through Lee Isenberg Associates Training Services to the CETA programs up to 1974 in an amount of about $45,000.

e. Two of the prime sponsors, Hartford and New Haven, still owe the CETA programs $50–60,000 and $7,000 respectively.

f. Although Ralph Cardone spent approximately 65% of his time on CETA work and 35% on Lee Isenberg Associates work, only 50% of his salary was derived from CETA Lee Isenberg Associates thereby subsidized Ralph Cardone's salary to the extent of $5,000 a year for 1976, 1977, and 1978 for a total of $15,-000.

g. Although Lee Isenberg was never compensated for the services he rendered

to the CETA programs in the years 1975–78, he spent approximately 50% of this time on the programs, the estimated value of which is $25,000 per year.

h. Ralph Cardone invested some of the CETA funds in commercial paper, which investments resulted in an additional $6,000 of surplus funds in the CETA accounts.

i. Additional unreimbersed benefits were received by the CETA programs in the form of Lee Isenberg Associates personnel who worked on the CETA programs but were entirely paid for by Lee Isenberg Associates, the absorption of indirect overhead costs, such as printing and copying expenses by Lee Isenberg Associates, and the payment by Lee Isenberg Associates of additional unreimbursed expenses, including but not limited to newspaper advertisements to attract prospective trainees and the subsidiation [sic] of prison training projects entered into with the Connecticut Commissioner of Corrections.

The plaintiff has moved to dismiss much of this "special defense," which it characterizes as a counterclaim. The United States argues that its sovereign immunity deprives the Court of jurisdiction over subsections 3a–3d, 3h and part of 3i. In the alternative, the Government argues that subsections 3a–3d are barred by the statute of limitations. As to 3g, the plaintiff moves not to dismiss but for summary judgment, arguing that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law.

### Discussion of Law

While the plaintiff has characterized the defendants' "special defense" as a counterclaim, the defendants maintain that it should be considered a special defense and that the plaintiff's motion to dismiss should more properly be considered a motion to strike. The rules of practice provide that "[w]hen a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading

as if there had been a proper designation." Fed.R.Civ.P. 8(c).

■ The Court is persuaded that the "special defense" asserted by the defendants is in the nature of a counterclaim against the United States. "[A]ny claim which a defendant has against the plaintiff is a counterclaim." Moore's Federal Practice ¶ 13.02. The defendants' own reasoning demonstrates the propriety of treating their "special defense" as a counterclaim:

> "[D]efendants have stated as a special defense the doctrine of equitable recoupment. . . . That doctrine is one which is equitable in nature, and provides a defendant sued by the United States with a waiver of the doctrine of sovereign immunity so as to enable it to assert a counterclaim against the United States if that counterclaim arises out of the same transaction or occurrence and does not seek affirmative relief."

The language of the defendants' brief thus forthrightly equates their "special defense" with a counterclaim. The Court will consider it as such.

A. *Subject Matter Jurisdiction as to ¶¶ 3a–3d, 3h & 3i*

As to ¶¶ 3a–3d, 3h and part of 3i, the plaintiff has moved to dismiss on the grounds that the Court lacks subject matter jurisdiction over a claim against the United States because of sovereign immunity. Rule 13 of the Federal Rules of Civil Procedure governs counterclaims:

> "(a) *Compulsory Counterclaims.* A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.
>
> . . . .
>
> "(b) *Permissive Counterclaims.* A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence

that is the subject matter of the opposing party's claim."

The United States' motion to dismiss the defendants' counterclaim as to subparts 3a–3d, 3h and part of 3i, is based on the doctrine of sovereign immunity. With respect to counterclaims, as well as original actions, the United States cannot be sued without its consent. *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940). Indeed, Rule 13 specifically provides that it does not abrogate the government's immunity from suit:

> "(d) *Counterclaim Against the United States.* These rules shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof.

Thus the defendants may assert a counterclaim against the United States only to the extent "fixed by law."

The law provides for a limited waiver of immunity—the doctrine of equitable recoupment. This exception is in the nature of a setoff in that it is limited to the amount of the government's claim, and of a compulsory counterclaim in that it must be related to the transaction upon which the government's claim is based.

> "When the sovereign sues it waives immunity as to the claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims."

*Frederick v. United States*, 386 F.2d 481, 488 (5th Cir.1967). *See United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). *See also* Wright & Miller, *Federal Practice and Procedure*, § 1427 (1971).

■ The central question in this case is whether the defendants' counterclaims "aris[e] out of the same transaction or occurrence which is the subject matter of the government's suit." Courts have equated this inquiry with the determination as to whether a counterclaim should be considered compulsory. In this regard, the courts have developed several tests:

> "(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
> "(2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
> "(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
> "(4) Is there any logical relation between the claim and the counterclaim?"

Wright & Miller, *Federal Practice and Procedure*, § 1410 (1971). In this Circuit the question is whether there is a "logical relationship" between the claim and counterclaim, *U.S. ex rel. D'Agostino Excavators, Inc. v. Heyward-Robinson Co.*, 430 F.2d 1077, 1081 (2d Cir.1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632, so as to cause them to be "inextricably intertwined." *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1071 (2d Cir.1977), *cert. denied* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782.

Several courts have specifically considered whether a counterclaim in equitable recoupment may be asserted against the United States. Among the salient factors identified by these courts are: (1) the "nature of the claims"; *Complaint of American Export Lines, Inc.*, 568 F.Supp. 956, 961 (1983); *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723, 737 (E.D.N.Y.1978); *In re Oxford Marketing, Ltd.*, 444 F.Supp. 399, 403 (N.D.Ill.1978); *United States v. Chatham*, 415 F.Supp. 1214, 1217 (N.D.Ga.1976); (2) whether there is a "logical relationship between the two"; *United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419, 432 (S.D.N.Y.1982); *Franklin National Bank*, 445 F.Supp. at 737; *Oxford Marketing*, 444

F.Supp. at 403; *Chatham,* 415 F.Supp. at 1217; (3) the similarity of the relevant facts and law; *United States v. Karlen,* 476 F.Supp. 306 (D.S.D.1979); *Franklin National Bank,* 445 F.Supp. at 737; *Chatham,* 415 F.Supp. at 1217; and (4) the similarity of the relevant evidence; *Federal Savings and Loan Insurance Corp. v. Williams,* 599 F.Supp. 1184, 1210 (D.Md. 1984); *Franklin National Bank,* 445 F.Supp. at 737; *Chatham,* 415 F.Supp. at 1217.

The courts' application of these principles to the facts is instructive. One court distinguished between a claim by the United States for damages caused by trespass of the defendant's livestock on land held by the Government in trust for an Indian tribe and a counterclaim for a trespass by Indian livestock on the defendant's land. *Karlen,* 476 F.Supp. at 308–09. Although the parties and the nature of the claims were the same, the counterclaim did not arise from the same transaction. *Id.* at 309. Thus distinct events, however similar, do not satisfy the equitable recoupment doctrine.

Less straightforward are cases in which the factual and legal claims are more closely related. In *Franklin National Bank,* the court dismissed several counterclaims and upheld another. The case involved, *inter alia,* claims brought by the Federal Deposit Insurance Corporation (FDIC) against several insurers "for breach of contract between the Insurance Companies and F[ranklin] N[ational] B[ank] ... [which] arise out of dishonesty *of employees of FNB* which are allegedly covered by defendants' Fidelity insurance policies." 445 F.Supp. at 737. The court found that there was no "logical relationship" between these claims of the FDIC and the insurers' counterclaims, which "sound in tort alleging breaches of statutory and common law duties by reason of alleged failure *of the Government* to properly regulate FNB." *Id.* By contrast, the court did not dismiss a counterclaim that alleged tortious misrepresentation in the FDIC's "proof of claim," *id.,* 737–38, apparently because of its more direct relationship to the contract question.

Similarly, in *Oxford Marketing,* the court dismissed the counterclaim of a trustee in bankruptcy who relied on the Federal Tort Claims Act in his claim that the Small Business Administration (SBA) had, by garnishing funds then controlled by the trustee, converted the debtor's bank account. Since the Government's action was "purely contractual," seeking "to enforce its rights as assignee of a promissory note and a security agreement executed by the bankrupt," the court held that there was no "logical relationship" between the claims. 444 F.Supp. at 403. The *Oxford Marketing* court noted that the counterclaim did not challenge the note's validity and that the chronology of events suggested no connection between the garnishment and the Government's action to reclaim collateral. *Id.*

These two cases imply that although the claim and counterclaim may be tied to the same underlying event or legal relationship, they will not be deemed to arise from the same transaction unless the claims are quite closely related, both legally and factually. These cases cannot be reconciled with *American Export Lines,* 568 F.Supp. 956. There the government sought damages for cargo it lost in a collision between commercial vessels. The court allowed a shipowner to seek, by way of counterclaim, indemnity against the United States; the shipowner claimed that it had relied on the government's advice in designing its steering system. *Id.* at 959, 961. Apparently unconcerned with the distinct nature of the legal claims, the court based its decision on the common triggering event, "the collision of the Sea Witch and the Esso Brussels." *Id.* at 961.

Similarly, in *Federal Savings and Loan Insurance Corp. v. Williams,* 599 F.Supp. 1184 (D.Md.1984), an action by the FSLIC against directors of a failed bank, the court permitted the defendants to assert a counterclaim against the FSLIC which alleged that the FSLIC had precipitated the bank's demise because both the claim and counterclaim involved the bank's insolvency. The court based this decision on its conclusion

that admission of the counterclaim would not "reduce the scope of the evidence proffered by the defendants" in the case. *Id.* at 1210. This was so because the evidence related to the counterclaim would be "the same or similar" to that which would be presented in their defense of the plaintiff's claim. It was this practical consideration that led the court to find that the claim and counterclaim "involve[d] substantially the same transaction." *Id.*

Finally, in *United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419 (S.D.N.Y.1982), the court addressed the question of equitable recoupment in the context of a delinquent SBA loan. The defendants had entered into a debt structure agreement (DSA) in an effort to repay their indebtedness under certain subcontracts with the government arranged through the SBA. *Id.* at 422–24. The Government's action was brought pursuant to an acceleration clause to recover the defendants' obligations under the DSA. *Id.* at 423–24. The counterclaims "revolve around the failure of the SBA to pay Business Development Expenses purportedly due and owing in connection with the 8(a) [sub]contracts." *Id.* at 432. Even though the DSA was designed to facilitate the defendants' efforts to meet their obligations under the subcontracts, the court held that those subcontracts were independent from the DSA, that the Development Expenses were not included in the terms of the DSA, and that the relationship between the defendants and the SBA was "not sufficient to 'inextricably intertwine' the counterclaims and the original complaint." *Id.* at 432. From *Wallace & Wallace* it is clear that the "same transaction" test can be applied quite narrowly. Even though the DSA, which represented the " 'entire understanding' of the parties," *id.* at 422, had subsumed the subcontracts, the court did not permit the defendants to raise by way of counterclaim an issue related to those subcontracts.

■ From the foregoing exposition of the case law, it is clear that the application of the equitable recoupment doctrine depends heavily upon the facts of each case. Although it is difficult to discern any consistent standards, the Court is persuaded that under any approach the challenged counterclaims in this case do not arise from the "same transaction" as the Government's suit.

The original complaint is an action to recover monies fraudulently obtained from the Government through the submission of false claims to the CETA program. It follows a criminal proceeding in which the defendant Lee Isenberg was convicted in connection with this scheme. The complaint identifies the relevant period as between October 21, 1975 and 1979.

Concededly the challenged counterclaims are related to the original complaint to the extent that both involve Lee Isenberg's business dealings with the CETA program. But the decisive question is whether these counterclaims arise out of the same transaction as the Government's claim—Lee Isenberg's submission of false claims to the government training program and, more generally, the manner in which he and LIA billed the government for labor costs. Several of the counterclaims allege that the defendants conferred monetary benefits upon the Government prior to 1975. These claims are without the time frame of the Government's complaint on their face. *See Oxford Marketing*, 444 F.Supp. at 403. As such they comprise different issues of fact and law than does the original complaint. It certainly cannot be said that they are "inextricably intertwined" with the Government's claim. Accordingly, the United States did not waive its sovereign immunity as to these claims and, hence, the Court lacks subject matter jurisdiction over them. Counterclaims 3a, 3b, and 3d must be dismissed.

■ Counterclaim 3c, unlike 3a, 3b, and 3d, does not specify the time of its accrual. It alleges that "[s]urplus funds were built up under the fixed price contracts and left in the CETA accounts, totalling approximately $150,000." The Government, in its brief, asserts that these events "for the most part preceded the CETA program,"

which began in 1973. The Court must, however, construe the challenged counterclaim in the light most favorable to the defendants, and it cannot conclude that the alleged buildup did not occur during the relevant period. Yet whatever the date of this event, it still does not arise out of the same transaction as the Government's claim, since it is unrelated to LIA and Lee Isenberg's billing of labor costs under the CETA program. Similarly, counterclaim 3h, by which the defendants seek credit for alleged profits obtained through investment of CETA funds, does not involve the submission of claims for reimbursement from the Government and therefore does not arise from the same transaction as the original complaint.

Finally, as to counterclaim 3i, part of which the Government moves to dismiss, LIA's "absorption" of overhead and advertising costs in connection with the training program is not "inextricably intertwined" with the United States' action to recover monies obtained by fraud. Therefore, that portion of 3i following the phrase "paid for by Lee Isenberg Associates" must be dismissed.

This determination is consistent with the case law. The claims of the United States and of the defendants are distinct. The Government action is in the nature of an intentional tort, *United States v. Hero*, No. 78–4587 slip op. (S.D.N.Y. July 27, 1981) [available on WESTLAW, DCTU database], while the defendants' counterclaims are quasi-contractual. *See Franklin National Bank*, 445 F.Supp. at 737; *Oxford Marketing*, 444 F.Supp. at 403. *But see American Export Lines*, 568 F.Supp. at 961. They involve different issues of fact and law; the Government's is a statutory action for whose proof it can rely to a considerable extent on the underlying criminal conviction while the defendants' counterclaims relate to different events and raise different legal questions. *See Franklin National Bank*, 445 F.Supp. at 737; *Chatham*, 415 F.Supp. at 1217. Nor is this a case like *Williams*, 599 F.Supp. at 1210, in which dismissal of the counterclaims would not effect the evidence to be presented at trial. Here the challenged counterclaims would expand significantly the defendants' case. Even under the broad test of *American Export Lines*, 568 F.Supp. at 961, the underlying event at issue here is the incident of fraud not the defendants' dealings with CETA, and the counterclaims therefore arise from a separate transaction. The "transaction" can be one in a series of dealings between the parties and remain distinct for purposes of the equitable recoupment doctrine. In *Wallace & Wallace* the "same transaction" was held to be the 8(a) subcontracts and not the DSA, 540 F.Supp. at 432; here the "same transaction" is the billing of labor costs and not the parties entire course of dealing.

That dismissal of these counterclaims is appropriate can further be seen by contrasting them with the counterclaims which were not challenged by the plaintiff on sovereign immunity grounds. Counterclaims 3f, 3g, and the first part of 3i allege that CETA was underbilled for the labor of Ralph Cardone, Lee Isenberg, and other LIA "personnel" during the period from 1975–1979. These claims, unlike those dismissed by the Court, relate directly to LIA and Lee Isenberg's billing of labor costs to the Government under the CETA program and, hence, the submission of false claims. Like issues of fact and law are involved; substantially the same evidence would be presented. The counterclaims fall within the time frame and subject matter of the Government's claim; they are "inextricably intertwined" with the original action.

### B. *Failure to State a Claim as to ¶ 3e*

Counterclaim 3e alleges that "[t]wo of the prime sponsors, Hartford and New Haven, still owe the CETA programs $50–60,000 and $7,000 respectively." The plaintiff moves to dismiss 3e on the grounds that it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The cities of Hartford and New Haven are not parties to this action, nor have the defendants sought to implead them. The defendants have advanced no

argument in their brief in support of this claim, nor can the Court perceive any plausible basis for it. Even were it considered as a defense and the plaintiff's motion as a motion to strike, Fed.R.Civ.P. 12(f), the defense would have to be stricken as clearly insufficient. Accordingly, counterclaim 3e must be dismissed.

### C. *Motion for Summary Judgment as to ¶ 3g*

Counterclaim 3g alleges that "Lee Isenberg was never compensated for the services he rendered to the CETA programs in the years 1975–1978, he spent approximately 50% of of this time on the programs, the estimated value of which is $25,000 per year." The plaintiff does not move to dismiss this counterclaim on sovereign immunity grounds, but instead moves for summary judgment. The Government contends that there is no genuine issue of material fact as to this claim and that it is entitled to judgment as a matter of law. Specifically, the Government argues that Lee Isenberg was fully compensated and that he had admitted as much in his sworn testimony at his criminal trial. In one portion of the quoted testimony Isenberg stated: "I spent a great deal of time on these programs. I didn't say that I felt entitled to be reimbursed with Federal dollars." He testified further that "it would have been self serving to have taken a federal fee for this particular type of work." The record supports the plaintiff's contention that any "entitlement" felt by Isenberg grew out of his belief that the Government had benefited from the alleged accumulation of funds in the accounts, and not that the Government had benefited from his services.

 While the defendant's belief is relevant, it is not determinative on the issue of the billing of labor costs. The question is whether the labor costs billed by LIA and Lee Isenberg to the Government fairly represented their actual value. Thus if the defendants can prove that the Government benefited from an underbilling of Isenberg's time, irrespective of his subjective

belief as to his entitlement, they should be able to offset the Government's claim for Isenberg's overstatement of the overall CETA labor costs. Accordingly, the motion for summary judgment as to counterclaim 3g must be denied.

### *Conclusion*

For the foregoing reasons, the plaintiff's motion to dismiss defendants' counterclaims 3a, 3b, 3c, 3d, 3e, 3h, and so much of 3i as follows the phrase "paid for by Lee Isenberg Associates" is granted and the counterclaims are dismissed. The plaintiff's motion for summary judgment as to counterclaim 3g is denied.

SO ORDERED.