Morris **BERGER**, Personal Representative of the Estate of Frank Kaufman, Plaintiff,

v.

The **CITY OF NORTH MIAMI, FLORIDA**, et al., Defendants.

Civ. No. 92–1344–A.

United States District Court, E.D. Virginia, Alexandria Division.

May 11, 1993.

Robert Stanley Hall, Jr., Washington, DC, for City of North Miami, FL.

Michael Jay Weiser, Alexandria, VA, for Morris Berger.

Frank Eugene Brown, Jr., Mays & Valentine, Arlington, VA, for Said Haddad.

Robert John Sciaroni, Sadur, Pelland & Rubinstein, Chartered, Washington, DC, Robert R. Vieth, McGuire, Woods, Battle & Boothe, McLean, VA, for Marvin Sadur.

Thomas Sykes Schaufelberger, Wright, Bobinson, McCammon, Othimer & Tatum, Washington, DC, for Post, Buckley, Shuh & Jernigan.

Frank Eugene Brown, Jr., Mays & Valentine, Richmond, VA, for ABC Demolition Corp.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

■ In its present posture, this case presents the question of whether time-barred state-law contract claims may be asserted as "recoupment" claims in response to a party's contribution claim for cleanup costs under Section 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f). Before the Court is the Rule 12(b)(6) motion of defendant City of North Miami ("North Miami") to dismiss recoupment claims raised by plaintiff Berger, as personal representative for the estate of Frank Kaufman ("the Estate"), and defendants ABC Demolition Company ("ABC") in connection with its CERCLA counterclaim. For the reasons that follow, the motion is granted.

### II.

The instant dispute arises from a failed attempt to develop a 350–acre tract of raw land in south Florida owned by the city of North Miami. In 1972, North Miami entered into a lease agreement with Munisport, Inc. ("Munisport") to construct a golf course and recreational facility on this undeveloped land. Munisport, a development company owned and controlled by Frank Kaufman, Said Haddad, and Marvin Sadur, agreed to develop the property in exchange for a thirty year lease on the property as improved. Under the terms of the lease agreement, Munisport would develop the raw land, fill it to usable grade, construct the golf course and other recreational facilities, and operate these facilities for thirty years to recoup its investment. While Munisport would operate the golf course and recreational facilities for a thirty year lease period, North Miami would receive rental fees and a portion of the profits during this period, as well as full control and ownership of the facilities following expiration of the thirty year lease term.

Munisport hired ABC, a construction company owned by Haddad and Kaufman, to provide personnel, equipment, and construction services to assist in development of the site. In addition, Munisport retained the services of an engineering and consulting firm, Post, Buckley, Shuh & Jernigan ("PBS & J") to aid in the design and construction of the proposed recreational facilities. To facilitate development of the property, Munisport and ABC, from 1974 to 1980, operated a landfill to raise the contours of low-lying areas of the property. In 1980, however, the State of Florida commenced proceedings to revoke Munisport's landfilling permit. Subsequently, the EPA took steps to remediate hazardous waste contamination caused by the landfilling operations. Shortly thereafter, EPA and North Miami entered into a consent decree, under which North Miami agreed to incur all response costs associated with cleanup of the site. Munisport abandoned the site and the lease in 1985.

North Miami subsequently initiated efforts to compel Kaufman, Haddad, Sadur, ABC, and PBS & J to bear part of the estimated $12 million in cleanup costs. To this end, following Kaufman's death in 1989, North Miami asserted a claim at the probate proceedings in the Virginia circuit court to block dissolution of Kaufman's assets. Thereafter, Berger, the personal representative for Kaufman's estate, filed this action seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2), absolving Kaufman of any liability under CERCLA or, in the alternative, apportioning liability among the potentially responsible parties.

Named as defendants in this action are North Miami, Haddad, Sadur, and PBS & J.

Relying on § 113(f)(1) of CERCLA, which permits persons liable for the remediation of a hazardous waste site to seek contribution from other potentially responsible parties for costs incurred in connection with cleanup efforts,[1] North Miami filed a counterclaim to compel the Estate, Haddad, ABC Demolition, Sadur, and PBS & J to shoulder their fair share of "response costs"—i.e., those costs associated with the remediation of the waste site. In essence, North Miami claims that these parties must contribute to the cleanup efforts because they were, under the terms of 42 U.S.C. § 9607(a), "owners" and "operators" of a hazardous waste facility and/or "generators" of hazardous wastes.[2]

In response, the Estate, ABC, and Haddad, by the way of so-called "recoupment" claims, asserted contract claims against North Miami that are the focus of the dismissal motion at bar. Specifically, these claims allege that North Miami breached the Munisport lease agreement by: (i) failing to obtain the necessary approvals for the Mun-

isport project; (ii) failing to exchange releases with Munisport and return deposits upon denial of the right to continue the landfill; (iii) failing adequately to defend against third-party interference with the project; and (iv) failing to reimburse Munisport for certain development costs it incurred. In addition, the Estate has asserted a *quantum meruit* claim for the enhanced value of the property from its activities in developing the property, including, *inter alia,* Munisport's operation of the landfill.[3] Presented for decision here is whether these "recoupment" claims may be properly asserted against North Miami's CERCLA counterclaim.[4]

## III.

■ Recoupment is a common law, equitable doctrine that permits a defendant to assert a defensive claim against a plaintiff, arising from the same contract or transaction as plaintiff's claim, to reduce the amount of the damages recoverable by plaintiff. In the Fourth Circuit's words:

> Recoupment is the right of the defendant to have plaintiff's monetary claim [re-

1. Specifically, § 113(f)(1) provides that:

   Any person may seek contribution from any other person who is liable under section 9607(a) of this title, during or following any civil action under section 9696 of this title or 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in absence of a civil action under section 9606 or section 9607 of this title.

   42 U.S.C. § 9613(f)(1).

2. CERCLA imposes strict liability on responsible parties. *See United States v. Monsanto Co.,* 858 F.2d 160, 167 (4th Cir.1988), *cert. denied* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Section 107(a) of CERCLA provides that liable persons include "the owner and operator or a vessel or facility" and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(1) and (2). In addition, CERCLA imposes liability on "any person who by contract, agreement or otherwise arranged for

disposal or treatment" or transportation of hazardous wastes. 42 U.S.C. § 9607(a)(3). Under section 107, owners, operators, transporters, and generators are all liable for "all costs of removal or remedial action incurred by the United States Government or a State" and "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(1)–(4)(B).

3. Sadur and PBS & J have not asserted any recoupment claims. In addition, while Haddad and ABC have not clearly set forth the basis of their recoupment claims, they are presumably predicated on allegations similar to those made by the Estate. Thus, for purposes of this motion, the Estate's claims will be viewed as representative of Haddad and ABC's claims as well.

4. North Miami's counterclaim also asserts several state law tort claims for nuisance, trespass, and violation of state environmental statutes. Yet, at its heart, this counterclaim is a CERCLA cost recovery/contribution action. As such, and given the dubious viability of these causes of action, the state law claims will not be considered for purposes of this motion. In any event, as the discussion below makes readily apparent, these state law claims are not directly related to the contract claims raised by the Estate, Haddad, and ABC, and thus do not arise from the same transaction as these claims.

duced] by reason of some claim the defendant has against the plaintiff arising from the very contract giving rise to plaintiff's claim.

*First National Bank v. Master Auto Service Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982).

■ The contours of the doctrine are well established. A properly asserted recoupment claim must: (i) arise from the same transaction or occurrence as the main claim; (ii) seek relief of the same kind and nature as that sought by the main claim; and (iii) be defensive in nature and seek no affirmative relief. *Frederick v. United States*, 386 F.2d 481, 487 (5th Cir.1967); *see also EEOC v. First Nat'l Bank*, 614 F.2d 1004, 1008 (5th Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 342 (1981). From this, it is apparent that there is a marked resemblance between the recoupment doctrine and compulsory counterclaims under Rule 13(a), Fed.R.Civ.P. Nor is this accidental; recoupment is the common law precursor to the modern compulsory counterclaim. *See generally* 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1401 (1990). Yet, the recoupment doctrine is more than a precursor; it has survived the codification of compulsory counterclaims and enjoys continuing vitality today as a means of asserting an otherwise time-barred counterclaim. *See United States v. Dalm*, 494 U.S. 596, 605, 110 S.Ct. 1361, 1367, 108 L.Ed.2d 548 (quoting *Bull v. United States*, 295 U.S. 247, 262, 55 S.Ct. 695, 700–01, 79 L.Ed. 1421 (1935)) (a recoupment defense is "never barred by the statute of limitations so long as the main action itself is timely"). In the case at bar, the contract claims asserted by the Estate are clearly time-barred and cannot be brought as independent actions or asserted as counterclaims under the Rule 13.[5] Conse-

quently, unless these claims fall within the scope of the recoupment doctrine, they cannot be asserted against North Miami in response to its CERCLA contribution claim.

■ The parties here dispute whether the claims of the Estate, ABC, and Haddad are eligible for the benefits of the recoupment doctrine. Central to this dispute is the question of whether the state law contract claims meet the first element of the recoupment test—i.e., whether they arise from the "same transaction" that forms the basis for North Miami's CERCLA counterclaim. Instructive in this regard is the test employed in the Rule 13(a), Fed.R.Civ.P., context to ascertain whether a counterclaim is compulsory, *i.e.*, whether it arises from the "same transaction or occurrence" as the main claim. *See United States v. Ownbey Enterprises, Inc.*, 780 F.Supp. 817, 820 (N.D.Ga.1991) (equating recoupment claim to compulsory counterclaim); *United States v. Isenberg*, 110 F.R.D. 387 (D.Conn.1986) (applying Rule 13(a) test in determining whether recoupment counterclaim arose from "same transaction" as main claim). Indeed, given the relationship and essential similarity between compulsory counterclaims and recoupment claims, there is no reason to refrain from using the Rule 13(a) standard to test whether a claim meets the first leg of the recoupment test. In addition, use of this standard is consistent with policy considerations relating to the just and expeditious resolution of CERCLA cases. This standard ensures that collateral matters are not joined with the CERCLA action so as to result in unwarranted expense and delay in resolution of the CERCLA claim. Under the Rule 13(a) standard, the following factors must be examined: (i) whether issues of fact and law raised by the claim and counterclaim are largely the same;

5. The parties do not dispute that Florida's five year statute of limitations for contract actions bars these claims. *Fla.Stat.* § 95.11 (five year limitation of "a legal or equitable action on a contract . . ."). Indeed, the well settled rule articulated in *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), providing that courts should apply the choice of law rules of its forum state in diversity cases, has been extended to apply in cases where state law claims are pendent to the federal claim. *See e.g., System*

*Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3rd Cir.1977); *Rental Car of New Hampshire, Inc. v. Westinghouse Electric Corp.*, 496 F.Supp. 373 (D.Mass.1980); *Chavez v. Southern Pac. Transportation Co.*, 413 F.Supp. 1203 (C.D.Cal.1976). Given this, Virginia's choice of law rules apply here and compels the use of Florida law. *See Occidental Fire & Cas. Co. v. Bankers & Shippers, Ins. Co.*, 564 F.Supp. 1501 (W.D.Va.1983) (disputes concerning performance of contract to be governed by law of the state of performance).

(ii) whether substantially the same evidence bears on both claims; and (iii) whether any logical relationship exists between the two claims. *Whigham v. Beneficial Finance Co.*, 599 F.2d 1322, 1323 (4th Cir.1979). Application of this standard to the contract claims asserted here compels the conclusion that they do not arise from the same transaction as North Miami's counterclaim. As such, they are not valid recoupment claims.

To begin with, North Miami's CERCLA contribution claim clearly implicates different factual and legal issues from those raised by the contract "recoupment" claims. Apportionment of CERCLA liability for cleanup costs requires application of federal law and involves factual inquiries into (i) the identity of the parties responsible for the generation and placement of hazardous substances on the property, and (ii) the extent to which each party controlled the operation of the Munisport landfill. By contrast, the alleged "recoupment" claims raise questions of state law and markedly different factual inquiries. Central to the resolution of these state claims will be facts relating to, *inter alia*, the proper interpretation of the lease agreement, the nature and scope of North Miami's obligations under this agreement, and any excuses or justifications for North Miami's alleged failure to fulfill these obligations.[6] Additionally, resolution of the *quantum meruit* claim raises factual issues relating to the nature and quality of the work performed by Kaufman, Haddad, and ABC, and the manner in which this work enhanced the market value of the developed property, none of which are relevant to any CERCLA issue.

Because the CERCLA issues differ from the state contract claim issues, so too will the evidence required to prove the claims differ. Thus, to prove that other parties to this action also bear responsibility under CERCLA, North Miami only needs to establish that they (i) owned, controlled or operated a hazardous waste facility or (ii) that they generated or transported hazardous wastes. 42

U.S.C. § 9607(a). As such, North Miami will need to introduce testimony and documents relating to the ownership, control, and day to day operation of the landfill. Especially relevant here will be evidence relating to which individuals and entities had responsibility for the disposal of hazardous wastes. By contrast, proof of the alleged contractual breaches will likely require more detailed testimony of the parties themselves relating to their contracting behavior, their understanding of their respective contractual obligations to explain possible ambiguities in the contract language, and the circumstances surrounding the alleged breaches of the lease agreement. In addition, evidence relating to the *quantum meruit* claim will center on establishing and documenting the actual work performed on the project site, including the construction of roads, drainage, and other facilities. Although the lease agreement itself is relevant to resolution of both the CERCLA and contract claims, the nature of this relevance is markedly different for each claim. In connection with the CERCLA contribution claim, the lease agreement will be useful in establishing the control of the various parties over the project site and the landfill. By contrast, the lease agreement is relevant in the state law claims to prove the terms of the contract between the Munisport and North Miami in connection with the state law contract claims. The lease agreement obviously assumes far greater importance in the latter instance than in the former. And contrary to the arguments of the Estate, Haddad, and ABC, the provisions in the lease agreement concerning operation of a landfill does not mean that breaches of this agreement are inextricably intertwined with liability under CERCLA for the generation and disposal of hazardous wastes. Common sense dictates otherwise. Put another way, whether North Miami breached its contractual obligations relating to the success of the Munisport project has no necessary, logical relationship to any of the parties' liability for contamination

---

**6.** More specifically, resolution of these contract claims will require factual inquiry into the following matters: (i) which party was responsible for obtaining the requisite permits and approvals; (ii) whether North Miami failed to obtain these permits; (iii) whether North Miami im-

properly retained certain lease deposits; and (iv) whether North Miami did, in fact, make concerted efforts to prevent third parties from interfering with the development of the Munisport project. None of these matters are relevant to the CERCLA issues.

of the project site or liability for the subsequent cleanup operations. Given the lack of such a direct, logical relationship, North Miami's CERCLA counterclaim does not arise from the "same transaction" as the state law contract claims.

This conclusion is supported by the relevant, albeit sparse, authority. Courts have permitted the assertion of recoupment claims against a CERCLA cost recovery action only where a tight nexus exists between these claims and the CERCLA cost recovery or contribution claim. Specifically, courts have permitted parties in CERCLA actions to raise state law tort claims where these claims related directly to cleanup operations conducted by the government or to the actual release and generation of hazardous wastes. In *United States v. Moore*, 703 F.Supp. 455 (E.D.Va.1988), for example, the court permitted defendants to maintain recoupment tort counterclaims against a government's CERCLA claim arising from (i) the government's alleged taking of 400 fire extinguishers during its cleanup operations; and (ii) the government's previous sale of defective gas cylinders to the defendants. The *Moore* court ruled that these tort claims arose from the same transaction as the CERCLA claim because the taking of fire extinguishers took place "*at the exact time* of the clean-up which form[ed] the basis of the government's suit;" and because the defective gas cylinders allegedly caused part of the contamination and thus "directly implicate[d] the issue of liability for cleanup costs." *Id.* at 459 (emphasis in original). But in the present case, the asserted "recoupment" claims do not relate directly either to the cleanup operations or the actual pollution of the landfill site. As a result, *Moore*'s facts are inapposite here.

The court in *United States v. Hardage*, 750 F.Supp. 1460 (W.D.Okla.1990) articulated a test even more restrictive than the *Moore* test in the course of ruling that the defendants there had not properly raised a recoupment claim, even though they sought to reduce CERCLA liability because of the government's negligence in conducting its cleanup operations. The *Hardage* court held that "the alleged negligence did not arise from the same transaction as the disposal of waste," and, as such, that defendants had "failed to show a nexus between the relief sought by the United States and the transactions or occurrences the recoupment counterclaim asserts." *Id.* at 1519. The teaching of *Hardage* is that recoupment claims in the CERCLA context must be directly related to the actual pollution of the affected site, *not* simply the cleanup operations. While the holdings of *Hardage* and *Moore* are arguably inconsistent, neither compels a result different from that reached in this case.[7] In sum, it is clear that the contract-based "recoupment" claims raised here do not arise from the cleanup operations or the actual generation or disposal of hazardous wastes. Equally clear then is that these claims do not arise from the same transaction as North Miami's CERCLA claim.

This conclusion finds further support in the recent decision in *Reading Co. v. Philadelphia*, 1993 WL 65825, 1993 U.S.Dist. LEXIS 2930 (E.D.Pa.1993), holding that the *lease-based* recoupment counterclaims there asserted did not arise from the same transaction as a CERCLA cost recovery claim. There, the City of Philadelphia leased Reading R.R. a number of railroad cars which subsequently leaked hazardous PCB wastes and required Reading to remediate the resulting contamination. Reading brought a cost recovery action against the City of Philadelphia, which, in turn, asserted a recoupment counterclaim based on indemnification provisions in the lease. The *Reading* court dismissed the recoupment claim, holding that: "[t]he fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, however, does not mean that the two arose from the 'same

---

7. More recent decisions suggest that the *Moore* approach is preferable. *See United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528 (E.D.Cal.1992), *reaff'd on reconsideration* (recoupment claim for damages to equipment, minerals, and property resulting from government's cleanup operations arose from same transaction as government's CERCLA cost recovery claim); *United States v. Amtreco, Inc.*, 790 F.Supp. 1576 (M.D.Ga.1992) (recoupment claim seeking to recover costs for property damage caused by government's cleanup operations arose from same transaction).

transaction.'" *Id.* (quoting *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984)).[8] Applied here, the *Reading* case clearly precludes the assertion of contract-based claims that are unrelated to the question of liability for the pollution and cleanup of hazardous wastes. In sum, it is pellucidly clear that these claims do not arise from the same transaction as North Miami's claim for contribution under CERCLA and, as a result, cannot be asserted under the doctrine of recoupment.

Distilled to its essence, the attempted assertion of contract-based "recoupment" claims in response to North Miami's CERCLA counterclaim represents nothing more than an imaginative, yet ultimately futile, effort to resurrect stale, time-barred claims that should have been raised long ago. Accordingly, pursuant to Rule 12(b)(6), Fed. R.Civ.P., the Court grants North Miami's motion to dismiss the contract claims miscast as "recoupment" claims for failure to state a claim upon which relief can be granted.

An appropriate order has issued.

---

8. Note here that the "recoupment" claims raised in *Reading* and in this case were raised in an attempt to assert claims otherwise barred by operation of the Bankruptcy Code. Similarly, in this case, the contract claims were asserted as "recoupment" claims because they would otherwise be barred by the statute of limitations.